CHRYSLER CORP. *v.* BROWN, SECRETARY OF
DEFENSE, ET AL.

No. 77–922.  Argued November 8, 1978—Decided April 18, 1979

REHNQUIST, J., delivered the opinion for a unanimous Court. MARSHALL, J., filed a concurring opinion, *post*, p. 319.

*Burt A. Braverman* argued the cause for petitioner. With him on the briefs was *A. William Rolf.*

*Assistant Attorney General Babcock* argued the cause for respondents. With her on the brief were *Solicitor General McCree, Leonard Schaitman,* and *Paul Blankenstein.**

---

*Briefs of *amici curiae* urging reversal were filed by *Paul L. Gomory* for the Association for the Advancement of Invention and Innovation; by *Joseph A. Keyes, Jr.,* for the Association of American Medical Colleges; by *Robert L. Ackerly, Thomas L. Patten, Kenneth W. Weinstein, Lawrence B. Kraus,* and *Stanley T. Kaleczyc* for the Chamber of Commerce of the United States; by *Michael S. Horne, Bruce D. Sokler, Stephen R. Mysliwiec, Robert E. Williams,* and *Douglas S. McDowell* for the Equal

Mr. Justice Rehnquist delivered the opinion of the Court.

The expanding range of federal regulatory activity and growth in the Government sector of the economy have increased federal agencies' demands for information about the activities of private individuals and corporations. These developments have paralleled a related concern about secrecy in Government and abuse of power. The Freedom of Information Act (hereinafter FOIA) was a response to this concern, but it has also had a largely unforeseen tendency to exacerbate the uneasiness of those who comply with governmental demands for information. For under the FOIA third parties have been able to obtain Government files containing information submitted by corporations and individuals who thought that the information would be held in confidence.

This case belongs to a class that has been popularly denominated "reverse-FOIA" suits. The Chrysler Corp. (hereinafter Chrysler) seeks to enjoin agency disclosure on the grounds that it is inconsistent with the FOIA and 18 U. S. C. § 1905, a criminal statute with origins in the 19th century that proscribes disclosure of certain classes of business and personal information. We agree with the Court of Appeals for the Third Circuit that the FOIA is purely a disclosure statute and affords Chrysler no private right of action to enjoin agency disclosure. But we cannot agree with that court's conclusion that this disclosure is "authorized by law" within the meaning of § 1905. Therefore, we vacate the Court of Appeals' judgment and remand so that it can consider

Employment Advisory Council; and by *Leonard J. Theberge* and *Edward H. Dowd* for the Scientists and Engineers for Secure Energy et al.

*Charles E. Hill* filed a brief for the Consumer Federation of America et al. as *amici curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Thomas L. Pfister* for Hughes Aircraft Co.; by *Richmond C. Coburn* and *Thomas E. Douglass* for the National Security Industrial Assn.; and by *George A. Sears* and *C. Douglas Floyd* for Standard Oil Co. of California.

whether the documents at issue in this case fall within the terms of § 1905.

## I

As a party to numerous Government contracts, Chrysler is required to comply with Executive Orders 11246 and 11375, which charge the Secretary of Labor with ensuring that corporations that benefit from Government contracts provide equal employment opportunity regardless of race or sex.[1] The United States Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) has promulgated regulations which require Government contractors to furnish reports and other information about their affirmative-action programs and the general composition of their work forces.[2]

The Defense Logistics Agency (DLA) (formerly the Defense Supply Agency) of the Department of Defense is the designated compliance agency responsible for monitoring Chrysler's employment practices.[3] OFCCP regulations require that Chrysler make available to this agency written affirmative-action programs (AAP's) and annually submit Employer Information Reports, known as EEO-1 Reports. The agency may also conduct "compliance reviews" and "complaint investigations," which culminate in Compliance Review Reports (CRR's) and Complaint Investigation Reports (CIR's), respectively.[4]

---

[1] Executive Order No. 11246, 3 CFR 339 (1964–1965 Comp.), prohibits discrimination on the basis of "race, creed, color, or national origin" in federal employment or by Government contractors. Under § 202 of this Executive Order, most Government contracts must contain a provision whereby the contractor agrees not to discriminate in such a fashion and to take affirmative action to ensure equal employment opportunity. With promulgation of Executive Order No. 11375, 3 CFR 684 (1966–1970 Comp.), in 1967, President Johnson extended the requirements of the 1965 Order to prohibit discrimination on the basis of sex.

[2] 41 CFR §§ 60-1.3, 60-1.7 (1978).

[3] For convenience all references will be to DLA.

[4] 41 CFR §§ 60-1.20, 60-1.24 (1978). The term "alphabet soup" gained currency in the early days of the New Deal as a description of the prolif-

Regulations promulgated by the Secretary of Labor provide for public disclosure of information from records of the OFCCP and its compliance agencies. Those regulations state that notwithstanding exemption from mandatory disclosure under the FOIA, 5 U. S. C. § 552,

> "records obtained or generated pursuant to Executive Order 11246 (as amended) . . . shall be made available for inspection and copying . . . if it is determined that the requested inspection or copying furthers the public interest and does not impede any of the functions of the OFCC[P] or the Compliance Agencies except in the case of records disclosure of which is prohibited by law." [5]

It is the voluntary disclosure contemplated by this regulation, over and above that mandated by the FOIA, which is the gravamen of Chrysler's complaint in this case.

This controversy began on May 14, 1975, when the DLA informed Chrysler that third parties had made an FOIA request for disclosure of the 1974 AAP for Chrysler's Newark, Del., assembly plant and an October 1974 CIR for the same facility. Nine days later, Chrysler objected to release of the requested information, relying on OFCCP's disclosure regulations and on exemptions to the FOIA. Chrysler also requested a copy of the CIR, since it had never seen it. DLA responded the following week that it had determined that the requested material was subject to disclosure under the FOIA and the OFCCP disclosure rules, and that both documents would be released five days later.

On the day the documents were to be released, Chrysler filed a complaint in the United States District Court for Delaware

---

eration of new agencies such as WPA and PWA. The terminology required to describe the present controversy suggests that the "alphabet soup" of the New Deal era was, by comparison, a clear broth.

[5] § 60–40.2 (a). The regulations also state that EEO–1 Reports "shall be disclosed," § 60–40.4, and that AAP's "must be disclosed" if not within limited exceptions. §§ 60–40.2 (b) (1), 60–40.3.

seeking to enjoin release of the Newark documents. The District Court granted a temporary restraining order barring disclosure of the Newark documents and requiring that DLA give five days' notice to Chrysler before releasing any similar documents. Pursuant to this order, Chrysler was informed on July 1, 1975, that DLA had received a similar request for information about Chrysler's Hamtramck, Mich., plant. Chrysler amended its complaint and obtained a restraining order with regard to the Hamtramck disclosure as well.

Chrysler made three arguments in support of its prayer for an injunction: that disclosure was barred by the FOIA; that it was inconsistent with 18 U. S. C. § 1905, 42 U. S. C. § 2000e–8 (e), and 44 U. S. C. § 3508, which for ease of reference will be referred to as the "confidentiality statutes"; and finally that disclosure was an abuse of agency discretion insofar as it conflicted with OFCCP rules. The District Court held that it had jurisdiction under 28 U. S. C. § 1331 to subject the disclosure decision to review under the Administrative Procedure Act (APA). 5 U. S. C. §§ 701–706. It conducted a trial *de novo* on all of Chrysler's claims; both sides presented extensive expert testimony during August 1975.

On April 20, 1976, the District Court issued its opinion. It held that certain of the requested information, the "manning" tables, fell within Exemption 4 of the FOIA.[6] The District Court reasoned from this holding that the tables may or must be withheld, depending on applicable agency regulations, and that here a governing regulation required that the information be withheld. Pursuant to 5 U. S. C. § 301, the enabling statute which gives federal department heads control over department records, the Secretary of Labor has promulgated a regulation, 29 CFR § 70.21 (a) (1978), stating that no officer or employee of the Department is to violate 18 U. S. C. § 1905. That section imposes criminal sanctions on Government em-

---

[6] Manning tables are lists of job titles and of the number of people who perform each job.

ployees who make unauthorized disclosure of certain classes of information submitted to a Government agency, including trade secrets and confidential statistical data. In essence, the District Court read § 1905 as not merely a prohibition of unauthorized disclosure of sensitive information by Government employees, but as a restriction on official agency actions taken pursuant to promulgated regulations.

Both sides appealed, and the Court of Appeals for the Third Circuit vacated the District Court's judgment. *Chrysler Corp.* v. *Schlesinger,* 565 F. 2d 1172 (1977). It agreed with the District Court that the FOIA does not compel withholding of information that falls within its nine exemptions. It also, like the District Court, rejected Chrysler's reliance on the confidentiality statutes, either because there was no implied private right of action to proceed under the statute, or because the statute, by its terms, was not applicable to the information at issue in this case. It agreed with the District Court that analysis must proceed under the APA. But it disagreed with that court's interpretation of 29 CFR § 70.21 (a). By the terms of that regulation, the specified disclosures are only proscribed if "not authorized by law," the standard of 18 U. S. C. § 1905. In the Court of Appeals' view, disclosures made pursuant to OFCCP disclosure regulations are "authorized by law" by virtue of those regulations. Therefore, it held that 29 CFR § 70.21 (a) was inapplicable.

The Court of Appeals also disagreed with the District Court's view of the scope of review under the APA. It held that the District Court erred in conducting a *de novo* review; review should have been limited to the agency record. However, the Court of Appeals found that record inadequate in this case and directed that the District Court remand to the agency for supplementation. Because of a conflict in the Circuits [7] and the general importance of these "reverse-FOIA"

---

[7] Compare *Westinghouse Electric Corp.* v. *Schlesinger,* 542 F. 2d 1190 (CA4 1976), cert. denied, 431 U. S. 924 (1977), with *Sears, Roebuck & Co.*

cases, we granted certiorari, 435 U. S. 914, and now vacate the judgment of the Third Circuit and remand for further proceedings.

## II

We have decided a number of FOIA cases in the last few years.[8] Although we have not had to face squarely the question whether the FOIA *ex proprio vigore* forbids governmental agencies from disclosing certain classes of information to the public, we have in the course of at least one opinion intimated an answer.[9] We have, moreover, consistently recognized that the basic objective of the Act is disclosure.[10]

---

v. *Eckerd,* 575 F. 2d 1197 (CA7 1978); *General Dynamics Corp.* v. *Marshall,* 572 F. 2d 1211 (CA8 1978); *Pennzoil Co.* v. *FPC,* 534 F. 2d 627 (CA5 1976); *Charles River Park "A," Inc.* v. *Department of HUD,* 171 U. S. App. D. C. 286, 519 F. 2d 935 (1975).

[8] *NLRB* v. *Robbins Tire & Rubber Co.,* 437 U. S. 214 (1978); *Department of Air Force* v. *Rose,* 425 U. S. 352 (1976); *FAA Administrator* v. *Robertson,* 422 U. S. 255 (1975); *NLRB* v. *Sears, Roebuck & Co.,* 421 U. S. 132 (1975); *Renegotiation Bd.* v. *Grumman Aircraft Engineering Corp.,* 421 U. S. 168 (1975); *Renegotiation Bd.* v. *Bannercraft Clothing Co.,* 415 U. S. 1 (1974); *EPA* v. *Mink,* 410 U. S. 73 (1973).

[9] "Subsection (b) of the Act creates nine exemptions from compelled disclosures. These exemptions are explicitly made exclusive, 5 U. S. C. § 552 (c), and are plainly intended to set up concrete, workable standards for determining whether particular material *may* be withheld or *must* be disclosed." *EPA* v. *Mink, supra,* at 79 (emphasis added).

[10] We observed in *Department of Air Force* v. *Rose, supra,* at 361, that "disclosure, not secrecy, is the dominant objective of the Act." The legislative history is replete with references to Congress' desire to loosen the agency's grip on the data underlying governmental decisionmaking.

"A democratic society requires an informed, intelligent electorate, and the intelligence of the electorate varies as the quantity and quality of its information varies. . . .

"[The FOIA] provides the necessary machinery to assure the availability of Government information necessary to an informed electorate." H. R. Rep. No. 1497, 89th Cong., 2d Sess., 12 (1966).

"Although the theory of an informed electorate is vital to the proper operation of a democracy, there is nowhere in our present law a statute

In contending that the FOIA bars disclosure of the requested equal employment opportunity information, Chrysler relies on the Act's nine exemptions and argues that they require an agency to withhold exempted material. In this case it relies specifically on Exemption 4:

> "(b) [FOIA] does not apply to matters that are—
>
> .    .    .    .    .
>
> "(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential . . . ." 5 U. S. C. § 552 (b)(4).

Chrysler contends that the nine exemptions in general, and Exemption 4 in particular, reflect a sensitivity to the privacy interests of private individuals and nongovernmental entities. That contention may be conceded without inexorably requiring the conclusion that the exemptions impose affirmative duties on an agency to withhold information sought.[11] In fact, that conclusion is not supported by the language, logic, or history of the Act.

The organization of the Act is straightforward. Subsection

---

which affirmatively provides for that information." S. Rep. No. 813, 89th Cong., 1st Sess., 3 (1965).

[11] See, e. g., H. R. Rep. No. 1497, supra, at 10 (emphasis added; footnote omitted):

"[Exemption 4] would assure the confidentiality of information obtained by the Government through questionnaires or through material submitted and disclosures made in procedures such as the mediation of labor-management controversies. It exempts such material if it would not customarily be made public by the person from whom it was obtained by the Government. . . . It would . . . include information which is given to an agency in confidence, since a citizen must be able to confide in his Government. Moreover, *where the Government has obligated itself in good faith not to disclose documents or information which it receives, it should be able to honor such obligations.*"

The italicized passage is obviously consistent with Exemption 4's being an exception to the disclosure mandate of the FOIA and not a limitation on agency discretion.

(a), 5 U. S. C. § 552 (a), places a general obligation on the agency to make information available to the public and sets out specific modes of disclosure for certain classes of information. Subsection (b), 5 U. S. C. § 552 (b), which lists the exemptions, simply states that the specified material is not subject to the disclosure obligations set out in subsection (a). By its terms, subsection (b) demarcates the agency's obligation to disclose; it does not foreclose disclosure.

That the FOIA is exclusively a disclosure statute is, perhaps, demonstrated most convincingly by examining its provision for judicial relief. Subsection (a)(4)(B) gives federal district courts "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U. S. C. § 552 (a)(4)(B). That provision does not give the authority to bar disclosure, and thus fortifies our belief that Chrysler, and courts which have shared its view, have incorrectly interpreted the exemption provisions of the FOIA. The Act is an attempt to meet the demand for open government while preserving workable confidentiality in governmental decision-making.[12] Congress appreciated that, with the expanding sphere of governmental regulation and enterprise, much of the information within Government files has been submitted by private entities seeking Government contracts or responding to unconditional reporting obligations imposed by law. There was sentiment that Government agencies should have the latitude, in certain circumstances, to afford the confidentiality desired by these submitters.[13] But the congressional concern

---

[12] See S. Rep. No. 813, *supra*, at 3:

"It is not an easy task to balance the opposing interests, but it is not an impossible one either. It is not necessary to conclude that to protect one of the interests, the other must, of necessity, either be abrogated or substantially subordinated. Success lies in providing a workable formula which encompasses, balances, and protects all interests, yet places emphasis on the fullest responsible disclosure."

[13] *Id.*, at 9; n. 11, *supra*.

was with the *agency's* need or preference for confidentiality; the FOIA by itself protects the submitters' interest in confidentiality only to the extent that this interest is endorsed by the agency collecting the information.

Enlarged access to governmental information undoubtedly cuts against the privacy concerns of nongovernmental entities, and as a matter of policy some balancing and accommodation may well be desirable. We simply hold here that Congress did not design the FOIA exemptions to be mandatory bars to disclosure.[14]

This conclusion is further supported by the legislative history. The FOIA was enacted out of dissatisfaction with § 3 of the APA, which had not resulted in as much disclosure by the agencies as Congress later thought desirable.[15] Statements in both the Senate and House Reports on the effect of the exemptions support the interpretation that the exemp-

---

[14] It is informative in this regard to compare the FOIA with the Privacy Act of 1974, 5 U. S. C. § 552a. In the latter Act, Congress explicitly requires agencies to withhold records about an individual from most third parties unless the subject gives his permission. Even more telling is 49 U. S. C. § 1357, a section which authorizes the Administrator of the FAA to take antihijacking measures, including research and development of protection devices.

"Notwithstanding [the FOIA], the Administrator shall prescribe such regulations as he may deem necessary to prohibit disclosure of any information obtained or developed in the conduct of research and development activities under this subsection if, in the opinion of the Administrator, the disclosure of such information—

.        .        .        .        .

"(B) would reveal trade secrets or privileged or confidential commercial or financial information obtained from any person . . . ." § 1357 (d) (2) (B).

[15] Section 3 of the original APA provided that an agency should generally publish or make available organizational data, general statements of policy, rules, and final orders. Exception was made for matters "requiring secrecy in the public interest" or "relating solely to the internal management of an agency." This original version of § 3 was repealed with passage of the FOIA. See *EPA* v. *Mink,* 410 U. S. 73 (1973).

tions were only meant to permit the agency to withhold certain information, and were not meant to mandate nondisclosure. For example, the House Report states:

> "[The FOIA] sets up workable standards for the categories of records which *may* be exempt from public disclosure . . . ."

> ". . . There may be legitimate reasons for nondisclosure and [the FOIA] is designed to *permit* nondisclosure in such cases."

> "[The FOIA] lists in a later subsection the specific categories of information which *may* be exempted from disclosure." [16]

We therefore conclude that Congress did not limit an agency's discretion to disclose information when it enacted the FOIA. It necessarily follows that the Act does not afford Chrysler any right to enjoin agency disclosure.

## III

Chrysler contends, however, that even if its suit for injunctive relief cannot be based on the FOIA, such an action can be premised on the Trade Secrets Act, 18 U. S. C. § 1905. The Act provides:

> "Whoever, being an officer or employee of the United States or of any department or agency thereof, publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such

---

[16] H. R. Rep. No. 1497, 89th Cong., 2d Sess., 2, 5, 7 (1966) (emphasis added). See also S. Rep. No. 813, 89th Cong., 1st Sess., 10 (1965). Congressman Moss, the House sponsor of the FOIA, described the exemptions on the House floor as indicating what documents "may be withheld." 112 Cong. Rec. 13641 (1966).

department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined not more than $1,000, or imprisoned not more than one year, or both; and shall be removed from office or employment."

There are necessarily two parts to Chrysler's argument: that § 1905 is applicable to the type of disclosure threatened in this case, and that it affords Chrysler a private right of action to obtain injunctive relief.

A

The Court of Appeals held that § 1905 was not applicable to the agency disclosure at issue here because such disclosure was "authorized by law" within the meaning of the Act. The court found the source of that authorization to be the OFCCP regulations that DLA relied on in deciding to disclose information on the Hamtramck and Newark plants.[17] Chrysler contends here that these agency regulations are not "law" within the meaning of § 1905.

It has been established in a variety of contexts that properly promulgated, substantive agency regulations have the "force and effect of law."[18] This doctrine is so well established that agency regulations implementing federal statutes have been

---

[17] 41 CFR §§ 60.40–1 to 60.40–4 (1978).

[18] E. g., Batterton v. Francis, 432 U. S. 416, 425 n. 9 (1977); Foti v. INS, 375 U. S. 217, 223 (1963); United States v. Mersky, 361 U. S. 431, 437–438 (1960); Atchison, T. & S. F. R. Co. v. Scarlett, 300 U. S. 471, 474 (1937).

held to pre-empt state law under the Supremacy Clause.[19] It would therefore take a clear showing of contrary legislative intent before the phrase "authorized by law" in § 1905 could be held to have a narrower ambit than the traditional understanding.

The origins of the Trade Secrets Act can be traced to Rev. Stat. § 3167, an Act which barred unauthorized disclosure of specified business information by Government revenue officers. There is very little legislative history concerning the original bill, which was passed in 1864.[20] It was re-enacted numerous times, with some modification, and remained part of the revenue laws until 1948.[21] Congressional statements made at the time of these re-enactments indicate that Congress was primarily concerned with unauthorized disclosure of business information by feckless or corrupt revenue agents,[22] for

---

[19] *Paul* v. *United States,* 371 U. S. 245 (1963); *Free* v. *Bland,* 369 U. S. 663 (1962); *Public Utilities Comm'n of California* v. *United States,* 355 U. S. 534 (1958).

[20] Revenue Act of 1864, § 38, 13 Stat. 238.

[21] The last version was codified as 18 U. S. C. § 216 (1940 ed.):

"It shall be unlawful for any collector, deputy collector, agent, clerk, or other officer or employee of the United States to divulge or to make known in any manner whatever not provided by law to any person the operations, style of work, or apparatus of any manufacturer or producer visited by him in the discharge of his official duties, or the amount or source of income, profits, losses, expenditures, or any particular thereof, set forth or disclosed in any income return, or to permit any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; and it shall be unlawful for any person to print or publish in any manner whatever not provided by law any income return, or any part thereof or source of income, profits, losses, or expenditures appearing in any income return; and any offense against the foregoing provision shall be a misdemeanor and be punished by a fine not exceeding $1,000 or by imprisonment not exceeding one year, or both, at the discretion of the court; and if the offender be an officer or employee of the United States he shall be dismissed from office or discharged from employment."

[22] See, *e. g.,* 26 Cong. Rec. 6893 (1894) (Sen. Aldrich) (expressing con-

in the early days of the Bureau of Internal Revenue, it was the field agents who had substantial contact with confidential financial information.[23]

In 1948, Rev. Stat. § 3167 was consolidated with two other statutes—involving the Tariff Commission and the Department of Commerce—to form the Trade Secrets Act.[24] The statute governing the Tariff Commission was very similar to Rev. Stat. § 3167, and it explicitly bound members of the Commission as well as Commission employees.[25] The Com-

---

cern that taxpayer's confidential information is "to be turned over to the tender mercies of poorly paid revenue agents"); *id.*, at 6924 (Sen. Teller) (exposing records to the "idle curiosity of a revenue officer"). See also Cong. Globe, 38th Cong., 1st Sess., 2997 (1864) (Rep. Brown) (expressing concern that 1864 revenue provisions would allow "every little petty officer" to investigate the affairs of private citizens).

[23] There was virtually no Washington bureaucracy created by the Act of July 1, 1862, ch. 119, 12 Stat. 432, the statute to which the present Internal Revenue Service can be traced. Researchers report that during the Civil War 85% of the operations of the Bureau of Internal Revenue were carried out in the field—"including the assessing and collection of taxes, the handling of appeals, and punishment for frauds"—and this balance of responsibility was not generally upset until the 20th century. L. Schmeckebier & F. Eble, The Bureau of Internal Revenue 8, 40–43 (1923). Agents had the power to enter any home or business establishment to look for taxable property and examine books of accounts. Information was collected and processed in the field. It is, therefore, not surprising to find that congressional comments during this period focused on potential abuses by agents in the field and not on breaches of confidentiality by a Washington-based bureaucracy.

[24] See H. R. Rep. No. 304, 80th Cong., 1st Sess., A127–A128 (1947).

[25] The Tariff Commission statute, last codified as 19 U. S. C. § 1335 (1940 ed.), provided:

"It shall be unlawful for any member of the commission, or for any employee, agent, or clerk of the commission, or any other officer or employee of the United States, to divulge, or to make known in any manner whatever not provided for by law, to any person, the trade secrets or processes of any person, firm, copartnership, corporation, or association embraced in any examination or investigation conducted by the commis-

merce Department statute embodied some differences in form. It was a mandate addressed to the Bureau of Foreign and Domestic Commerce and to its Director, but there was no reference to Bureau employees and it contained no criminal sanctions.[26] Unlike the other statutes, it also had no exception for disclosures "authorized by law." In its effort to "consolidat[e]" the three statutes, Congress enacted § 1905 and essentially borrowed the form of Rev. Stat. § 3167 and the Tariff Commission statute.[27] We find nothing in the legislative history of § 1905 and its predecessors which lends support to Chrysler's contention that Congress intended the phrase "authorized by law," as used in § 1905, to have a special, limited meaning.

Nor do we find anything in the legislative history to support the respondents' suggestion that § 1905 does not address formal agency action—*i. e.*, that it is essentially an "antileak" statute that does not bind the heads of governmental departments or agencies. That would require an expansive and unprecedented holding that any agency action directed or approved by an agency head is "authorized by law," regard-

---

sion, or by order of the commission, or by order of any member thereof. Any offense against the provisions of this section shall be a misdemeanor and be punished by a fine not exceeding $1,000, or by imprisonment not exceeding one year, or both, in the discretion of the court, and such offender shall also be dismissed from office or discharged from employment."

[26] 15 U. S. C. § 176a (1940 ed.):

"Any statistical information furnished in confidence to the Bureau of Foreign and Domestic Commerce by individuals, corporations, and firms shall be held to be confidential, and shall be used only for the statistical purposes for which it is supplied. The Director of the Bureau of Foreign and Domestic Commerce shall not permit anyone other than the sworn employees of the Bureau to examine such individual reports, nor shall he permit any statistics of domestic commerce to be published in such manner as to reveal the identity of the individual, corporation, or firm furnishing such data."

[27] H. R. Rep. No. 304, *supra* n. 24, at A127.

less of the statutory authority for that action. As Attorney General Brownell recognized not long after § 1905 was enacted, such a reading is difficult to reconcile with Congress' intent to consolidate the Tariff Commission and Commerce Department statutes, both of which explicitly addressed ranking officials, with Rev. Stat. § 3167.[28] It is also inconsistent with a settled understanding—previously shared by the Department of Justice—that has been continually articulated and relied upon in Congress during the legislative efforts in the last three decades to increase public access to Government information.[29] Although the existence of this understanding

---

[28] In a December 1, 1953, opinion, the Attorney General advised the Secretary of the Treasury that he should regard himself as bound by § 1905. The Attorney General noted:

"The reviser of the Criminal Code describes the provision as a consolidation of three other sections formerly appearing in the United States Code. Of the three, two expressly operated as prohibitions on the heads of agencies." 41 Op. Atty. Gen. 166, 167 (footnote omitted).

See also *id.*, at 221 (Atty. Gen. Brownell advising Federal Communications Commission Chairman to regard himself as bound).

[29] If we accepted the respondents' position, 18 U. S. C. § 1905 would simply be irrelevant to the issue of public access to agency information. The FOIA and other such "access" legislation are concerned with formal agency action—to what extent can an agency or department or, put differently, the head of an agency or department withhold information contained within the governmental unit's files. It is all but inconceivable that a Government employee would *withhold* information which his superiors had directed him to release; and these Acts are simply not addressed to *disclosure* by a Government employee that is not sanctioned by the employing agency. This is not to say that the actions of individual employees might not be inconsistent with the access legislation. But such actions are only inconsistent insofar as they are imputed to the agencies themselves. Therefore, if § 1905 is not addressed to formal agency action—*i. e.*, action approved by the agency or department head—there should have been no concern in Congress regarding the interrelationship of § 1905 and the access legislation, for they would then address totally different types of disclosure.

In fact, the legislative history of all the significant access legislation of the last 20 years evinces a concern with this relationship and a

is not by any means dispositive, it does shed some light on the intent of the enacting Congress. See *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 380–381 (1969); *FHA*

concomitant universal assumption that § 1905 embraces formal agency action. Congress was assured that the 1958 amendment to 5 U. S. C. § 301, the housekeeping statute that affords department heads custodial responsibility for department records, would not circumscribe the confidentiality mandated by § 1905. The 1958 amendment simply clarified that § 301 itself was not substantive authority to withhold information. See *infra*, at 310–312. Also in 1958 the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary conducted hearings on the power of the President to withhold information from Congress. As part of the investigative effort, a list was compiled of all statutes restricting disclosure of Government information. Section 1905 was listed among them. Hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary on S. 921, 85th Cong., 2d Sess., pt. 2, p. 986 (1958). Two years later, the House Committee on Government Operations conducted a study on statutory authorities restricting or requiring the release of information under the control of executive departments or independent agencies, and again prominent among the statutes "affecting the availability of information to the public" was 18 U. S. C. § 1905. House Committee on Government Operations, Federal Statutes on the Availability of Information 262 (Comm. Print. 1960) (§ 1905 denominated as statute prohibiting the disclosure of certain information).

In *FAA Administrator* v. *Robertson*, 422 U. S., at 264–265, we recognized the importance of these lists in Congress' later deliberations concerning the FOIA, particularly in the consideration of the original Exemption 3. That Exemption excepted from the operation of the FOIA matters "specifically exempted from disclosure by statute." As we noted in *Robertson:*

"When the House Committee on Government Operations focused on Exemption 3, it took note that there are 'nearly 100 statutes or parts of statutes which restrict public access to specific Government records. *These would not be modified* by the public records provisions of [the FOIA].' H. R. Rep. No. 1497, 89th Cong., 2d Sess., 10 (1966). (Emphasis added.)" *Id.*, at 265.

In determining that the statute at issue in *Robertson,* 49 U. S. C. § 1504, was within Exemption 3, we observed that the statute was on these prior lists and that the Civil Aeronautics Board had brought the statute to the attention of both the House and Senate Committees as an exempting statute during the hearings on the FOIA. 422 U. S., at 264, and n. 11. In

v. *The Darlington, Inc.*, 358 U. S. 84, 90 (1958). In sum, we conclude that § 1905 does address formal agency action and that the appropriate inquiry is whether OFCCP's regulations provide the "authoriz[ation] by law" required by the statute.

In order for a regulation to have the "force and effect of law," it must have certain substantive characteristics and be the product of certain procedural requisites. The central distinction among agency regulations found in the APA is that between "substantive rules" on the one hand and "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice" on the other.[30] A "sub-

---

fact, during those hearings 18 U. S. C. § 1905 was the most frequently cited restriction on agency or department disclosure of information. Hearings before the Subcommittee of the House Committee on Government Operations on H. R. 5012 et al., 89th Cong., 1st Sess., 283 (1965) (cited by 28 agencies as authority for withholding information). Among those citing the statute was the Department of Justice. *Id.*, at 386 ("commercial information received or assembled in connection with departmental functions must be withheld pursuant to these requirements"). See also *id.*, at 20 (colloquy between Rep. Moss and Asst. Atty. Gen. Schlei); Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act 31–32 (June 1967) (18 U. S. C. § 1905 among the "nearly 100 statutes" mentioned in the House Report).

Most recently, in its Report on the Government in the Sunshine Act, the House Committee on Government Operations observed:

"[T]he Trade Secrets Act, 18 U. S. C. § 1905, which relates only to the disclosure of information where disclosure is 'not authorized by law,' would not permit the withholding of information otherwise required to be disclosed by the Freedom of Information Act, since the disclosure is there authorized by law. Thus, for example, if material did not come within the broad trade secrets exemption contained in the Freedom of Information Act, section 1905 would not justify withholding; on the other hand, if material is within the trade secrets exemption of the Freedom of Information Act and therefore subject to disclosure if the agency determines that disclosure is in the public interest, section 1905 must be considered to ascertain whether the agency is forbidden from disclosing the information." H. R. Rep. No. 94–880, pt. 1, p. 23 (1976).

[30] 5 U. S. C. §§ 553 (b), (d).

stantive rule" is not defined in the APA, and other authoritative sources essentially offer definitions by negative inference.[31] But in *Morton* v. *Ruiz*, 415 U. S. 199 (1974), we noted a characteristic inherent in the concept of a "substantive rule." We described a substantive rule—or a "legislative-type rule," *id.*, at 236—as one "affecting individual rights and obligations." *Id.*, at 232. This characteristic is an important touchstone for distinguishing those rules that may be "binding" or have the "force of law." *Id.*, at 235, 236.

That an agency regulation is "substantive," however, does not by itself give it the "force and effect of law." The legislative power of the United States is vested in the Congress, and the exercise of quasi-legislative authority by governmental departments and agencies must be rooted in a grant of such power by the Congress and subject to limitations which that body imposes. As this Court noted in *Batterton* v. *Francis*, 432 U. S. 416, 425 n. 9 (1977):

"Legislative, or substantive, regulations are 'issued by an agency pursuant to statutory authority and . . . imple-

---

[31] Neither the House nor Senate Report attempted to expound on the distinction. In prior cases, we have given some weight to the Attorney General's Manual on the Administrative Procedure Act (1947), since the Justice Department was heavily involved in the legislative process that resulted in the Act's enactment in 1946. See *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U. S. 519, 546 (1978); *Power Reactor Co.* v. *Electricians*, 367 U. S. 396, 408 (1961); *United States* v. *Zucca*, 351 U. S. 91, 96 (1956).

The Manual refers to substantive rules as rules that "implement" the statute. "Such rules have the force and effect of law." Manual, *supra*, at 30 n. 3. In contrast it suggests that "interpretive rules" and "general statements of policy" do not have the force and effect of law. Interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Ibid.* General statements of policy are "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Ibid.* See also Final Report of Attorney General's Committee on Administrative Procedure 27 (1941).

ment the statute, as, for example, the proxy rules issued by the Securities and Exchange Commission . . . . Such rules have the force and effect of law.' " [32]

Likewise the promulgation of these regulations must conform with any procedural requirements imposed by Congress. *Morton* v. *Ruiz, supra,* at 232. For agency discretion is limited not only by substantive, statutory grants of authority, but also by the procedural requirements which "assure fairness and mature consideration of rules of general application." *NLRB* v. *Wyman-Gordon Co.,* 394 U. S. 759, 764 (1969). The pertinent procedural limitations in this case are those found in the APA.

The regulations relied on by the respondents in this case as providing "authoriz[ation] by law" within the meaning of § 1905 certainly affect individual rights and obligations; they govern the public's right to information in records obtained under Executive Order 11246 and the confidentiality rights of those who submit information to OFCCP and its compliance agencies. It is a much closer question, however, whether they are the product of a congressional grant of legislative authority.

In his published memorandum setting forth the disclosure regulations at issue in this case, the Secretary of Labor states that the authority upon which he relies in promulgating the regulations are § 201 of Executive Order 11246, as amended, and 29 CFR § 70.71 (1978), which permits units in the Department of Labor to promulgate supplemental disclosure regulations consistent with 29 CFR pt. 70 and the FOIA. 38 Fed. Reg. 3192–3194 (1973). Since materials that are exempt from disclosure under the FOIA are by virtue of Part II of this opinion outside the ambit of that Act, the Government cannot rely on the FOIA as congressional authorization for

---

[32] Quoting Attorney General's Manual on the Administrative Procedure Act, *supra,* at 30 n. 3.

disclosure regulations that permit the release of information within the Act's nine exemptions.

Section 201 of Executive Order 11246 directs the Secretary of Labor to "adopt such rules and regulations and issue such orders as he deems necessary and appropriate to achieve the purposes thereof." But in order for such regulations to have the "force and effect of law," it is necessary to establish a nexus between the regulations and some delegation of the requisite legislative authority by Congress. The origins of the congressional authority for Executive Order 11246 are somewhat obscure and have been roundly debated by commentators and courts.[33] The Order itself as amended establishes a program to eliminate employment discrimination by the Federal Government and by those who benefit from Government contracts. For purposes of this case, it is not necessary to decide whether Executive Order 11246 as amended is authorized by the Federal Property and Administrative Services Act of 1949,[34] Titles VI

---

[33] See, e. g., *Contractors Assn. of Eastern Pa.* v. *Secretary of Labor*, 442 F. 2d 159 (CA3), cert. denied, 404 U. S. 854 (1971); Hearings before the Subcommittee on Separation of Powers of the Senate Committee on the Judiciary on the Philadelphia Plan and S. 931, 91st Cong., 1st Sess. (1969); Jones, The Bugaboo of Employment Quotas, 1970 Wis. L. Rev. 341; Leiken, Preferential Treatment in the Skilled Building Trades: An Analysis of the Philadelphia Plan, 56 Cornell L. Rev. 84 (1970); Comment, The Philadelphia Plan: A Study in the Dynamics of Executive Power, 39 U. Chi. L. Rev. 723 (1972); Note, Executive Order 11246: Anti-Discrimination Obligations in Government Contracts, 44 N. Y. U. L. Rev. 590 (1969).

The Executive Order itself merely states that it is promulgated "[u]nder and by virtue of the authority vested in [the] President of the United States by the Constitution and statutes of the United States." 3 CFR 339 (1964–1965 Comp.).

[34] 63 Stat. 377, as amended, 40 U. S. C. § 471 *et seq.* The Act as amended is prefaced with the following declaration of policy:

"It is the intent of the Congress in enacting this legislation to provide for the Government an economical and efficient system for (a) the procurement and supply of personal property and nonpersonal services, including related functions such as contracting, inspection, storage, issue, specifica-

and VII of the Civil Rights Act of 1964,[35] the Equal Employment Opportunity Act of 1972,[36] or some more general notion that the Executive can impose reasonable contractual require-

tions, property identification and classification, transportation and traffic management, establishment of pools or systems for transportation of Government personnel and property by motor vehicle within specific areas, management of public utility services, repairing and converting, establishment of inventory levels, establishment of forms and procedures, and representation before Federal and State regulatory bodies; (b) the utilization of available property; (c) the disposal of surplus property; and (d) records management." 40 U. S. C. § 471.

The Act explicitly authorizes Executive Orders "necessary to effectuate [its] provisions." § 486 (a). However, nowhere in the Act is there a specific reference to employment discrimination.

Lower courts have suggested that § 486 (a) was the authority for predecessors of Executive Order 11246. *Farmer* v. *Philadelphia Electric Co.*, 329 F. 2d 3 (CA3 1964); *Farkas* v. *Texas Instrument, Inc.*, 375 F. 2d 629 (CA5), cert. denied, 389 U. S. 977 (1967). But as the Third Circuit noted in *Contractors Assn. of Eastern Pa.* v. *Secretary of Labor, supra,* at 167, these suggestions were dicta and made without any analysis of the nexus between the Federal Property and Administrative Services Act and the Executive Orders. It went on to hold, however, that § 486 (a) was authority for at least some aspects of Executive Order 11246 on the ground that "it is in the interest of the United States in all procurement to see that its suppliers are not over the long run increasing its costs and delaying its programs by excluding from the labor pool available minority workmen." 442 F. 2d, at 170.

[35] 42 U. S. C. §§ 2000d to 2000d–4, 2000e to 2000e–17. Significantly, the question has usually been put in terms of whether Executive Order 11246 is inconsistent with these titles of the Civil Rights Act of 1964. See, *e. g., Contractors Assn. of Eastern Pa.* v. *Secretary of Labor, supra,* at 171–174.

Title VI grants federal agencies that are "empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract," the authority to promulgate rules "which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." Such rules must be approved by the President, and their enforcement is subject to congressional review. "In the case of any action terminating, or refusing to

ments in the exercise of its procurement authority.[37] The pertinent inquiry is whether under any of the arguable *statutory* grants of authority the OFCCP disclosure regulations relied on by the respondents are reasonably within the contemplation of that grant of authority. We think that it is clear that when it enacted these statutes, Congress was not concerned with public disclosure of trade secrets or confidential business information, and, unless we were to hold that any federal statute that implies some authority to collect information must grant *legislative* authority to disclose that information to the public, it is simply not possible to find in these statutes a delegation of the disclosure authority asserted by the respondents here.[38]

---

grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action." § 602 of the Civil Rights Act of 1964, 78 Stat. 252, 42 U. S. C. § 2000d–1. Executive Order 11246 contains no provision for congressional review, and therefore is not promulgated pursuant to § 602. Cf. Exec. Order No. 11247, 3 CFR 348 (1964–1965 Comp.). Titles VI and VII contain no other express substantive delegation to the President.

[36] This is an argument that Congress ratified Executive Order 11246 as amended, when it rejected a series of amendments to the Equal Employment Opportunity Act that were designed to cut back on affirmative-action efforts under the Executive Order.

[37] See *Farkas* v. *Texas Instrument, Inc., supra; Farmer* v. *Philadelphia Electric Co., supra;* cf. *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113 (1940); *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 637 (1952) (Jackson, J., concurring).

[38] The respondents cite *Jones* v. *Rath Packing Co.,* 430 U. S. 519, 536 (1977), for the proposition that "it has long been acknowledged that administrative regulations consistent with the agencies' substantive statutes have the force and effect of law." Brief for Respondents 38, and n. 24. The legislative delegation in that case, however, was quite explicit. The issue was whether state regulation of the labeling of meats and flour was pre-empted by the Federal Meat Inspection Act (FMIA), the Federal

The relationship between any grant of legislative authority and the disclosure regulations becomes more remote when one examines § 201 of the Executive Order. It speaks in terms of rules and regulations "necessary and appropriate" to achieve the purposes of the Executive Order. Those purposes are an end to discrimination in employment by the Federal Government and those who deal with the Federal Government. One cannot readily pull from the logic and purposes of the Executive Order any concern with the public's access to information in Government files or the importance of protecting trade secrets or confidential business statistics.

The "purpose and scope" section of the disclosure regulations indicates two underlying rationales: OFCCP's general policy "to disclose information to the public," and its policy "to cooperate with other public agencies as well as private parties seeking to eliminate discrimination in employment." 41 CFR § 60–40.1 (1978). The respondents argue that "[t]he purpose of the Executive Order is to combat discrimination in employment, and a disclosure policy designed to further this purpose is consistent with the Executive Order and an appropriate subject for regulation under its aegis." Brief for Respondents 48. Were a grant of legislative authority as a basis for Executive Order 11246 more clearly identifiable, we might agree with the respondents that this "compatibility" gives the disclosure regulations the necessary legislative force. But the thread between these regulations and any grant of

---

Food, Drug, and Cosmetic Act (FDCA), and the Fair Packaging and Labeling Act. The FMIA provides that meat or a meat product is misbranded

"(5) if in a package or other container unless it bears a label showing . . . (B) an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count: *Provided,* That . . . reasonable variations may be permitted, and exemptions as to small packages may be established, by regulations prescribed by the Secretary." § 1 (n) (5) of the FMIA, 21 U. S. C. § 601 (n) (5).

There is a similar provision in the FDCA.

authority by the Congress is so strained that it would do violence to established principles of separation of powers to denominate these particular regulations "legislative" and credit them with the "binding effect of law."

This is not to say that any grant of legislative authority to a federal agency by Congress must be specific before regulations promulgated pursuant to it can be binding on courts in a manner akin to statutes. What is important is that the reviewing court reasonably be able to conclude that the grant of authority contemplates the regulations issued. Possibly the best illustration remains Mr. Justice Frankfurter's opinion for the Court in *National Broadcasting Co.* v. *United States,* 319 U. S. 190 (1943). There the Court rejected the argument that the Communications Act of 1934 did not give the Federal Communications Commission authority to issue regulations governing chain broadcasting beyond the specification of technical, engineering requirements. Before reaching that conclusion, however, the Court probed the language and logic of the Communications Act and its legislative history. Only after this careful parsing of authority did the Court find that the regulations had the force of law and were binding on the courts unless they were arbitrary or not promulgated pursuant to prescribed procedures.

> "Our duty is at an end when we find that the action of the Commission was based upon findings supported by evidence, and was made pursuant to authority granted by Congress. It is not for us to say that the 'public interest' will be furthered or retarded by the Chain Broadcasting Regulations. The responsibility belongs to the Congress for the grant of valid legislative authority and to the Commission for its exercise." *Id.,* at 224.

The respondents argue, however, that even if these regulations do not have the force of law by virtue of Executive Order 11246, an explicit grant of legislative authority for such

regulations can be found in 5 U. S. C. § 301, commonly referred to as the "housekeeping statute." [39]   It provides:

> "The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property.   This section does not authorize withholding information from the public or limiting the availability of records to the public."

The antecedents of § 301 go back to the beginning of the Republic, when statutes were enacted to give heads of early Government departments authority to govern internal departmental affairs.   Those laws were consolidated into one statute in 1874 and the current version of the statute was enacted in 1958.

Given this long and relatively uncontroversial history, and the terms of the statute itself, it seems to be simply a grant of authority to the agency to regulate its own affairs.   What is clear from the legislative history of the 1958 amendment to § 301 is that this section was not intended to provide authority for limiting the scope of § 1905.[40]

---

[39] See H. R. Rep. No. 1461, 85th Cong., 2d Sess., 1 (1958):

"The law has been called an office 'housekeeping' statute, enacted to help General Washington get his administration underway by spelling out the authority for executive officials to set up offices and file Government documents.   The documents involved are papers pertaining to the day-to-day business of Government which are not restricted under other specific laws nor classified as military information or secrets of state."

The Secretary of Labor did not cite this statute as authority for the OFCCP disclosure regulations.   38 Fed. Reg. 3192–3193 (1973).

[40] This does not mean, of course, that disclosure regulations promulgated on the basis of § 301 are "in excess of statutory jurisdiction, authority, or limitations" for purposes of the APA, 5 U. S. C. § 706 (2) (C).   It simply means that disclosure pursuant to them is not "authorized by law" within the meaning of § 1905.

The 1958 amendment to § 301 was the product of congressional concern that agencies were invoking § 301 as a source of authority to withhold information from the public. Congressman Moss sponsored an amendment that added the last sentence to § 301, which specifically states that this section "does not authorize withholding information from the public." The Senate Report accompanying the amendment stated:

> "Nothing in the legislative history of [§ 301] shows that Congress intended this statute to be a grant of authority to the heads of the executive departments to withhold information from the public or to limit the availability of records to the public." S. Rep. No. 1621, 85th Cong., 2d Sess., 2 (1958).

The logical corollary to this observation is that there is nothing in the legislative history of § 301 to indicate it is a substantive grant of legislative power to promulgate rules authorizing the *release* of trade secrets or confidential business information. It is indeed a "housekeeping statute," authorizing what the APA terms "rules of agency organization, procedure or practice" as opposed to "substantive rules." [41]

---

[41] The House Committee on Government Operations cited approvingly an observation by legal experts that

"[§ 301] merely gives department heads authority to regulate within their departments the way in which requests for information are to be dealt with—for example, by centralizing the authority to deal with such requests in the department head." H. R. Rep. No. 1461, 85th Cong., 2d Sess., 7 (1958).

It noted that the members of its Special Subcommittee on Government Information

"unanimously agreed that [§ 301] originally was adopted in 1789 to provide for the day-to-day office housekeeping in the Government departments, but through misuse it has become twisted into a claim of authority to withhold information." *Id.*, at 12.

There are numerous remarks to similar effect in the Senate Report and the floor debates. See, *e. g.*, S. Rep. No. 1621, 85th Cong., 2d Sess., 2 (1958); 104 Cong. Rec. 6549 (Rep. Moss), 6560 (Rep. Fascell), 15690–15696 (colloquy between Sens. Hruska and Johnston) (1958).

This would suggest that regulations pursuant to § 301 could not provide the "authoriz[ation] by law" required by § 1905. But there is more specific support for this position. During the debates on the 1958 amendment Congressman Moss assured the House that the amendment would "not affect the confidential status of information given to the Government and carefully detailed in title 18, United States Code, section 1905." 104 Cong. Rec. 6550 (1958).

The respondents argue that this last statement is of little significance, because it is only made with reference to the amendment. But that robs Congressman Moss' statement of any substantive import. If Congressman Moss thought that records within the terms of § 1905 could be released on the authority of a § 301 regulation, why was he (and presumably the House) concerned with whether the amendment affected § 1905? Under the respondents' interpretation, records released pursuant to § 301 are outside § 1905 by virtue of the first sentence of § 301.

The remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history. Congressman Moss' statement must be considered with the Reports of both Houses and the statements of other Congressmen, all of which refute the respondents' interpretation of the relationship between § 301 and § 1905.[42] Of greatest significance, however,

---

[42] Throughout the floor debates references are made to 78 statutes that require the withholding of information, and assurances are consistently given that these statutes are not in any way affected by § 301. *E. g.,* 104 Cong. Rec. 6548 (Rep. Brown), 6549–6550 (Rep. Moss) (1958). It is clear from Congressman Moss' comments that § 1905 is one of those statutes. 104 Cong. Rec. 6549–6550 (1958). There is also frequent reference to trade secrets as not being disclosable and the confidentiality of that information as not being affected by § 301. H. R. Rep. No. 1461, 85th Cong., 2d Sess., 2 (1958); 104 Cong. Rec. 6558 (Rep. Fascell), 6564 (Rep. Wright) (1958). The following exchange between Congressmen Meader and Moss is also instructive.

"Mr. MEADER. Mr. Chairman, I should like the attention of the gentleman from California [Mr. Moss], the sponsor of the measure. I

is the "housekeeping" nature of § 301 itself. On the basis of this evidence of legislative intent, we agree with the Court of Appeals for the District of Columbia Circuit that "[s]ection 301 does not authorize regulations limiting the scope of section 1905." *Charles River Park "A," Inc.* v. *Department of HUD,* 171 U. S. App. D. C. 286, 293–294, 519 F. 2d 935, 942–943 (1975).

There is also a procedural defect in the OFCCP disclosure regulations which precludes courts from affording them the force and effect of law. That defect is a lack of strict compliance with the APA. Recently we have had occasion to examine the requirements of the APA in the context of "legislative" or "substantive" rulemaking. In *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.,* 435 U. S. 519 (1978), we held that courts could only in "extraordinary circumstances" impose procedural requirements on an agency beyond those specified in the APA. It is within

would like to read three paragraphs from the additional views I submitted to the report which appear upon page 62 of the report. I said:

"I believe there is unanimous sentiment in the Government Operations Committee on the following points:

"1. That departments and agencies of the Government have construed [§ 301] to authorize them to withhold information from the public and to limit the availability of records to the public.

"2. That this interpretation is a strained and erroneous interpretation of the intent of Congress in [§ 301] which merely authorized department heads to make regulations governing day-to-day operation of the department—a so-called housekeeping function; and that [§ 301] was not intended to deal with the authority to *release* or withhold information or records.

. . . . .

"I now yield to the gentleman from California to state whether or not those three points as I have set them forth in my additional views in the report on this measure accurately state what he understands to be the consensus of the judgment of the members of the Government Operations Committee in reporting out this legislation?

"MR. MOSS. That is correct as I interpret it." *Id.,* at 6562 (emphasis added).

an agency's discretion to afford parties more procedure, but it is not the province of the courts to do so. In *Vermont Yankee,* we recognized that the APA is " 'a formula upon which opposing social and political forces have come to rest.' " *Id.,* at 547 (quoting *Wong Yang Sung* v. *McGrath,* 339 U. S. 33, 40 (1950)). Courts upset that balance when they override informed choice of procedures and impose obligations not required by the APA. By the same token, courts are charged with maintaining the balance: ensuring that agencies comply with the "outline of minimum essential rights and procedures" set out in the APA. H. R. Rep. No. 1980, 79th Cong., 2d Sess., 16 (1946); see *Vermont Yankee Nuclear Power Corp., supra,* at 549 n. 21. Certainly regulations subject to the APA cannot be afforded the "force and effect of law" if not promulgated pursuant to the statutory procedural minimum found in that Act.[43]

Section 4 of the APA, 5 U. S. C. § 553, specifies that an agency shall afford interested persons general notice of proposed rulemaking and an opportunity to comment before a substantive rule is promulgated.[44] "Interpretive rules, general

---

[43] See, *e. g., Morton* v. *Ruiz,* 415 U. S. 199 (1974); *United States* v. *Allegheny-Ludlum Steel Corp.,* 406 U. S. 742, 758 (1972).

[44] 5 U. S. C. § 553:

"(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

"(1) a military or foreign affairs function of the United States; or

"(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

"(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

"(1) a statement of the time, place, and nature of public rule making proceedings;

"(2) reference to the legal authority under which the rule is proposed; and

statements of policy or rules of agency organization, procedure or practice" are exempt from these requirements. When the Secretary of Labor published the regulations pertinent in this case, he stated:

> "As the changes made by this document relate solely to interpretive rules, general statements of policy, and to rules of agency procedure and practice, neither notice of proposed rule making nor public participation therein is required by 5 U. S. C. 553. Since the changes made by this document either relieve restrictions or are interpretative rules, no delay in effective date is required by 5

---

"(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

"Except when notice or hearing is required by statute, this subsection does not apply—

"(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

"(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

"(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

"(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

"(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

"(2) interpretative rules and statements of policy; or

"(3) as otherwise provided by the agency for good cause found and published with the rule.

"(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule."

U. S. C. 553 (d). These rules shall therefore be effective immediately.

"In accordance with the spirit of the public policy set forth in 5 U. S. C. 553, interested persons may submit written comments, suggestions, data, or arguments to the Director, Office of Federal Contract Compliance . . . ." 38 Fed. Reg. 3193 (1973).

Thus, the regulations were essentially treated as interpretative rules and interested parties were not afforded the notice of proposed rulemaking required for substantive rules under 5 U. S. C. § 553 (b). As we observed in *Batterton* v. *Francis,* 432 U. S., at 425 n. 9: "[A] court is not required to give effect to an interpretative regulation. Varying degrees of deference are accorded to administrative interpretations, based on such factors as the timing and consistency of the agency's position, and the nature of its expertise." We need not decide whether these regulations are properly characterized as "interpretative rules." It is enough that such regulations are not properly promulgated as substantive rules, and therefore not the product of procedures which Congress prescribed as necessary prerequisites to giving a regulation the binding effect of law.[45] An interpretative regulation or general state-

---

[45] The regulations at issue in *Jones* v. *Rath Packing Co.,* see n. 38, *supra,* were the product of notice of proposed rulemaking and comment. 32 Fed. Reg. 10729 (1967); 35 Fed. Reg. 15552 (1970).

We also note that the respondents' reliance on *FCC* v. *Schreiber,* 381 U. S. 279 (1965), is misplaced. In that case the Court held that a FCC rule—that investigatory proceedings would be public unless a hearing examiner found that "the public interest, the proper dispatch of the business . . . , or the ends of justice" would be served by closed sessions— was consistent with the pertinent congressional grant of authority and not arbitrary or unreasonable. This Court held that the District Court impermissibly invaded the province of the agency when it imposed its own notions of proper procedures. Cf. *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.,* 435 U. S. 519 (1978). There was no question in the case regarding the applicability of § 1905. Moreover, the respondents had made a broad request that "*all* testimony and

ment of agency policy cannot be the "authoriz[ation] by law" required by § 1905.

This disposition best comports with both the purposes underlying the APA and sound administrative practice. Here important interests are in conflict: the public's access to information in the Government's files and concerns about personal privacy and business confidentiality. The OFCCP's regulations attempt to strike a balance. In enacting the APA, Congress made a judgment that notions of fairness and informed administrative decisionmaking require that agency decisions be made only after affording interested persons notice and an opportunity to comment. With the consideration that is the necessary and intended consequence of such procedures, OFCCP might have decided that a different accommodation was more appropriate.

## B

We reject, however, Chrysler's contention that the Trade Secrets Act affords a private right of action to enjoin disclosure in violation of the statute. In *Cort* v. *Ash,* 422 U. S. 66 (1975), we noted that this Court has rarely implied a private right of action under a criminal statute, and where it has done so "there was at least a statutory basis for inferring that a civil cause of action of some sort lay in favor of someone." [46] Nothing in § 1905 prompts such an inference. Nor are other pertinent circumstances outlined in *Cort* present here. As our review of the legislative history of § 1905—or

---

documents to be elicited from them . . . should be received *in camera.*" 381 U. S., at 295 (emphasis in original). The Court held that when specific information was requested that might actually injure Schreiber's firm competitively, "there would be ample opportunity to request that it be received in confidence, and to seek judicial protection if the request were denied." *Id.,* at 296.

[46] 422 U. S., at 79, citing *Wyandotte Transportation Co.* v. *United States,* 389 U. S. 191 (1967); *J. I. Case Co.* v. *Borak,* 377 U. S. 426 (1964); *Texas & Pacific R. Co.* v. *Rigsby,* 241 U. S. 33 (1916).

lack of same—might suggest, there is no indication of legislative intent to create a private right of action. Most importantly, a private right of action under § 1905 is not "necessary to make effective the congressional purpose," *J. I. Case Co.* v. *Borak,* 377 U. S. 426, 433 (1964), for we find that review of DLA's decision to disclose Chrysler's employment data is available under the APA.[47]

IV

While Chrysler may not avail itself of any violations of the provisions of § 1905 in a separate cause of action, any such violations may have a dispositive effect on the outcome of judicial review of agency action pursuant to § 10 of the APA. Section 10 (a) of the APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved· by agency action . . . , is entitled to judicial review thereof." 5 U. S. C. § 702. Two exceptions to this general rule of reviewability are set out in § 10. Review is not available where "statutes preclude judicial review" or where "agency action is committed to agency discretion by law." 5 U. S. C. §§ 701 (a)(1), (2). In *Citizens to Preserve Overton Park, Inc.* v. *Volpe,* 401 U. S. 402, 410 (1971), the Court held that the latter exception applies "where 'statutes are drawn in such broad terms that in a given case there is no law to apply,'" quoting S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945). Were we simply confronted with the authorization in 5 U. S. C. § 301 to prescribe regulations regarding "the custody, use, and preservation of [agency] records, papers, and property," it would be difficult to derive any standards limiting agency conduct which might constitute "law to apply." But our discussion in Part III demonstrates

---

[47] Jurisdiction to review agency action under the APA is found in 28 U. S. C. § 1331. See *Califano* v. *Sanders,* 430 U. S. 99 (1977).

Chrysler does not argue in this Court, as it did below, that private rights of action are available under 42 U. S. C. § 2000e-8 (e) and 44 U. S. C. § 3508.

that § 1905 and any "authoriz[ation] by law" contemplated by that section place substantive limits on agency action.[48] Therefore, we conclude that DLA's decision to disclose the Chrysler reports is reviewable agency action and Chrysler is a person "adversely affected or aggrieved" within the meaning of § 10 (a).

Both Chrysler and the respondents agree that there is APA review of DLA's decision. They disagree on the proper scope of review. Chrysler argues that there should be *de novo* review, while the respondents contend that such review is only available in extraordinary cases and this is not such a case.

The pertinent provisions of § 10 (e) of the APA, 5 U. S. C. § 706, state that a reviewing court shall

> "(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> .        .        .        .        .
>
> "(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."

For the reasons previously stated, we believe any disclosure that violates § 1905 is "not in accordance with law" within the meaning of 5 U. S. C. § 706 (2)(A). *De novo* review by the District Court is ordinarily not necessary to decide whether a contemplated disclosure runs afoul of § 1905. The District Court in this case concluded that disclosure of some of Chrysler's documents was barred by § 1905, but the Court of Appeals did not reach the issue. We shall therefore vacate the Court of Appeals' judgment and remand for further proceedings consistent with this opinion in order that the Court

---

[48] By regulation, the Secretary of Labor also has imposed the standards of § 1905 on OFCCP and its compliance agencies. 29 CFR § 70.21 (1978).

of Appeals may consider whether the contemplated disclosures would violate the prohibition of § 1905.[49]  Since the decision regarding this substantive issue—the scope of § 1905—will necessarily have some effect on the proper form of judicial review pursuant to § 706 (2), we think it unnecessary, and therefore unwise, at the present stage of this case for us to express any additional views on that issue.

*Vacated and remanded.*

Mr. Justice Marshall, concurring.

I agree that respondents' proposed disclosure of information is not "authorized by law" within the meaning of 18 U. S. C. § 1905, and I therefore join the opinion of the Court.  Because the number and complexity of the issues presented by this case will inevitably tend to obscure the dispositive conclusions, I wish to emphasize the essential basis for the decision today.

This case does not require us to determine whether, absent a congressional directive, federal agencies may reveal information obtained during the exercise of their functions.  For whatever inherent power an agency has in this regard, § 1905 forbids agencies from divulging certain types of information unless disclosure is independently "authorized by law."  Thus, the controlling issue in this case is whether the OFCCP dis-

---

[49] Since the Court of Appeals assumed for purposes of argument that the material in question was within an exemption to the FOIA, that court found it unnecessary expressly to decide that issue and it is open on remand.  We, of course, do not here attempt to determine the relative ambits of Exemption 4 and § 1905, or to determine whether § 1905 is an exempting statute within the terms of the amended Exemption 3, 5 U. S. C. § 522 (b) (3).  Although there is a theoretical possibility that material might be outside Exemption 4 yet within the substantive provisions of § 1905, and that therefore the FOIA might provide the necessary "authoriz[ation] by law" for purposes of § 1905, that possibility is at most of limited practical significance in view of the similarity of language between Exemption 4 and the substantive provisions of § 1905.

closure regulations, 41 CFR §§ 60.40-1 to 60.40-4 (1978), provide the requisite degree of authorization for the agency's proposed release. The Court holds that they do not, because the regulations are not sanctioned directly or indirectly by federal legislation.[1] In imposing the authorization requirement of § 1905, Congress obviously meant to allow only those disclosures contemplated by congressional action. *Ante,* at 298–312. Otherwise, the agencies Congress intended to control could create their own exceptions to § 1905 simply by promulgating valid disclosure regulations. Finally, the Court holds that since § 10 (e) of the Administrative Procedure Act requires agency action to be "in accordance with law," 5 U. S. C. § 706 (2)(A), a reviewing court can prevent any disclosure that would violate § 1905:[2]

Our conclusion that disclosure pursuant to the OFCCP regulations is not "authorized by law" for purposes of § 1905, however, does not mean *the regulations themselves* are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" for purposes of the Administrative Procedure Act. 5 U. S. C. § 706 (2)(C). As the Court recognizes, *ante,* at 309 n. 40, that inquiry involves very different considerations than those presented in the instant case. Accordingly, we do not question the general validity of these OFCCP regulations or any other regulations promulgated under § 201 of Executive Order No. 11246, 3 CFR 340 (1964–1965 Comp.). Nor do we consider whether such an Executive Order must be founded on a legislative enactment. The

---

[1] That the OFCCP regulations were not promulgated in strict compliance with the Administrative Procedure Act, *ante,* at 312–316, is an independent reason why those regulations do not satisfy the requirements of § 1905, although the agency could rectify this shortcoming.

[2] Thus, the courts below must determine on remand whether § 1905 covers the types of information respondents intended to disclose. Disclosure of those documents not covered by § 1905 would, under the Court's holding, be "in accordance with law." 5 U. S. C. § 706 (2)(A).

Court's holding is only that the OFCCP regulations in issue here do not "authorize" disclosure within the meaning of § 1905.

Based on this understanding, I join the opinion of the Court.