792 F.2d 1165
 253 U.S.App.D.C. 211
 PHILLIPS PETROLEUM COMPANY, et al., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Arizona Public Service Company, Midwest Energy, Inc., K N
Energy, Inc., Gulf States Utilities Company, El
Paso Natural Gas Company, Intervenors.
 No. 85-1427.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 14, 1986.
Decided June 13, 1986.
 
 Charles L. Pain, with whom Jennifer A. Cates, Bartlesville, Okl., was on brief, for petitioner, Phillips Petroleum Co.
 Richard A. Solomon, Washington, D.C., for intervenor, Midwest Energy, Inc.
 John N. Estes, III, Atty., F.E.R.C., for respondent; William H. Satterfield, Gen. Counsel, Barbara J. Weller, Deputy Sol. and Leslie J. Lawner, Atty., F.E.R.C., Washington, D.C., were on brief, for respondent.
 
 
 1
 Daniel F. Collins, with whom Terry O. Vogel and Richard W. Miller, Jr., Washington, D.C., were on brief, for intervenor, K N Energy, Inc.
 
 
 2
 Tamara L. Huddleston and Herbert I. Zinn, Tucson, Ariz., entered appearances for intervenor, Arizona Public Service Co.
 
 
 3
 Janet M. Robins and George A. Avery, Washington, D.C., entered appearances for intervenor, Gulf States Utility Co.
 
 
 4
 Scott D. Fobes and Richard C. Green, El Paso, Tex., entered appearances for intervenor, El Paso Natural Gas Co.
 
 
 5
 Before WALD and EDWARDS, Circuit Judges, and KOZINSKI,* Circuit Judge, United States Court of Appeals for the Ninth Circuit.
 
 
 6
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 
 HARRY T. EDWARDS, Circuit Judge:
 
 7
 Section 104 of the Natural Gas Policy Act of 1978 ("NGPA") provides that the maximum lawful price for the first sale of natural gas committed to interstate commerce on November 8, 1978 shall be "the just and reasonable rate ... established by the Commission which was (or would have been) applicable to ... such natural gas on April 20, 1977."[1] As is all too often the case with deceptively simple statutory provisions, section 104 admits of a troublesome ambiguity: there are two different sources of natural gas--gas produced by pipeline companies and gas produced by independent companies--and there were separate rate structures for these different sources of natural gas in April 1977. While pipeline-produced gas rates were set pursuant to cost-of-service rate making on a pipeline by pipeline basis, independent-producer gas rates were set on a national basis. Thus, in implementing section 104, it is unclear whether Congress intended the Federal Energy Regulatory Commission ("FERC" or "Commission") to look to the April 1977 rate for the gas of a particular pipeline or the April 1977 rate that had been established for independent gas.
 
 
 8
 Believing itself bound by the Supreme Court's decision in Public Service Commission of New York v. Mid-Louisiana Gas Co.,[2] FERC issued regulations that set the section 104 price ceilings at the April 1977 independent-producer national levels for both pipeline-produced gas and independent-producer gas. Phillips Petroleum Company ("Phillips"), an independent producer, challenges this resolution of the statutory ambiguity, arguing that section 104 requires FERC to apply the national rates only to independent-producer gas and to price pipeline gas at the April 1977 cost-of-service rate then in effect for each pipeline.
 
 
 9
 Although under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,[3] the FERC interpretation is arguably a permissible reading of section 104, FERC did not purport to give its own reading to the statute; rather, it believed that its interpretation of section 104 was mandated by Mid-Louisiana. Because we conclude that the Mid-Louisiana decision required no such interpretation, we hold that, under the principles of SEC v. Chenery Corp.,[4] a remand is necessary to allow FERC to reconsider the proper construction of section 104.
 
 I. BACKGROUND
 
 10
 This case can be understood only in the context of the evolution of natural gas price policy in the last few decades. Beginning in 1938, FERC's predecessor, the Federal Power Commission ("FPC"), regulated sales of natural gas in interstate commerce under the Natural Gas Act ("NGA"). Initially, the FPC took the position that it need not directly review the price that independent producers charged pipelines at the wellhead because the price of natural gas was regulated at the downstream end of interstate pipelines. In other words, the Commission only evaluated the reasonableness of the price of pipeline-produced gas by examining the "cost-of-service" incurred in producing and transporting the gas. Under this cost-of-service rate making, the FPC set only the downstream rates charged to gas distributors for pipeline gas. Gas production expenses were treated merely as costs that the FPC evaluated for reasonableness.
 
 
 11
 This procedure changed in 1954 when the Supreme Court, in Phillips Petroleum Co. v. Wisconsin,[5] held that the Natural Gas Act required the FPC to evaluate the reasonableness of rates charged by independent producers of gas. At first, the FPC fulfilled this obligation by simply using a cost-of-service methodology for all natural gas produced--whether by an independent producer, a pipeline company or an affiliate of a pipeline company. Ultimately, however, this approach proved impractical. The number of pipeline companies was relatively small, but the number of independent-gas producers was far too large for the use of a cost-of-service methodology. As a result, in 1960 the FPC changed its method of regulating independent producers. Instead of establishing individual rates for each producer, it established rates applicable to all producers in an assigned production region.
 
 
 12
 The FPC continued to use cost-of-service rate making for the pricing of gas produced by pipeline companies and pipeline affiliates until 1969. In that year, the FPC decided to apply the regional producer rates to all gas produced by pipeline companies from leases acquired after October 7, 1969. For the pipeline-produced gas still priced by cost-of-service rate making, however, the Commission did not set a just and reasonable rate for the wellhead price of gas. Instead, the FPC continued its practice of using cost-of-service rate making to set only the downstream rates charged gas distributors, with gas acquisition costs tested for "prudence."
 
 
 13
 The next significant change took place in 1974, when the FPC shifted from regional rates to a single national rate applicable to both gas produced by independent companies and new gas produced by pipeline companies. Thus, by April 20, 1977, the determinative date in this case, the following regulatory structure had evovled:
 
 
 14
 (1) Pipeline-company gas from wells drilled on or before January 1, 1973, or from leases acquired on or before October 7, 1969 was priced on a cost-of-service basis.
 
 
 15
 (2) All other pipeline-produced gas was priced in the same manner as gas produced by independent companies.
 
 
 16
 (3) Gas produced by independent companies was priced on a nationwide basis.
 
 
 17
 In 1978, Congress radically transformed the regulation of natural gas by enacting the Natural Gas Policy Act of 1978. Title I of that Act established eight categories of natural gas production and set a ceiling price for all "first sales"[6] of gas in each category. Section 104 of the NGPA set a price ceiling for natural gas "committed or dedicated to interstate commerce" on the day before the enactment of the NGPA. The maximum lawful price for this gas is the just and reasonable rate established by the Commission for the gas under the NGA, increased by an inflation factor:
 
 
 18
 The maximum lawful price under this section for any month shall be the higher of--
 
 
 19
 (A)(i) the just and reasonable rate, per million Btu's, established by the Commission which was (or would have been) applicable to the first sale of such natural gas on April 20, 1977, in the case of April 1977;
 
 
 20
 and
 
 
 21
 (ii) in the case of any month thereafter, the maximum lawful price, per million Btu's, prescribed under this subparagraph for the preceding month multiplied by the monthly equivalent of the annual inflation adjustment factor applicable for such month,
 
 
 22
 or
 
 
 23
 (B) any just and reasonable rate which was established by the Commission after April 27, 1977, and before the date of the enactment of this Act and which is applicable to such natural gas.[7]
 
 
 24
 FERC initially took the position that the intracorporate transfer at the wellhead of pipeline-produced gas was not a "first sale" within the meaning of the NGPA. This position was reversed by the Supreme Court in Public Service Commission of New York v. Mid-Louisiana Gas Co.,[8] which held that all pipeline production was subject to NGPA pricing. On remand, FERC issued an order implementing the Mid-Louisiana decision.
 
 
 25
 In Order No. 391,[9] FERC ruled that if gas was committed or dedicated to interstate commerce before the NGPA was enacted and a cost-of-service rate was in effect for the gas, the appropriate section 104 price ceiling would be the NGA price that would have applied to the gas if it had been sold by an independent producer. Essentially, therefore, FERC eliminated one of the last vestiges of its previous distinction between independent-producer gas and pipeline-produced gas.
 
 
 26
 Although Phillips did not participate in the rulemaking that led to Order No. 391, it did file an application for rehearing. In this application, Phillips principally argued that pipeline-produced gas priced under cost-of-service methodology should not be subject to the same ceiling price as gas produced by independent producers. Instead, Phillips urged, pipeline-produced gas should be priced at the rate the FPC had established for the gas using cost-of-service methodology. In Order No. 391-A[10] FERC rejected this argument. It concluded that the Mid-Louisiana decision mandated identical treatment of pipeline and producer gas:
 
 
 27
 Phillips' position would not permit a pipeline to receive the same section 104 rate that a producer would receive. Gas produced by an independent producer that was committed or dedicated to the interstate market before the date of enactment of the NGPA for which a just and reasonable rate was in effect qualifies for the section 104 rate. The Commission blieves [sic] the Mid-Louisiana decision requires parity treatment for producer and pipeline production. To achieve this result the Commission believes that pipeline production previously priced on a cost-of-service basis must be permitted to receive the section 104 NGPA ceiling prices.[11]
 
 
 28
 This petition for review followed.
 
 II. ANALYSIS
 A. Standing
 
 29
 At the outset, we first briefly address the contention of K N Energy, Inc., an intervening pipeline company, that Phillips lacks standing. We have little difficulty in rejecting this challenge because Phillips clearly has standing as a consumer of natural gas.
 
 
 30
 After oral argument, we ordered Phillips to file a supplemental statement confirming its status as a consumer of natural gas. This statement established irrefutably that Phillips is a large industrial corporation with offices in 217 American cities. As such, Phillips is a consumer of natural gas at many of its local offices, and several of these offices are in areas served by pipeline companies that produce some of their own gas. The record before us indicates that the likely result of FERC's new regulation will be an increase in the price paid by consumers for pipeline-produced natural gas. As such, we hold that Phillips has " 'alleged such a personal stake in the outcome of the controversy' as to warrant [its ] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on [its] behalf."[12]
 
 B. The FERC Order
 
 31
 This case involves an agency's attempt to interpret an admittedly ambiguous statute. Under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,[13] if Congress has not spoken clearly on the precise question at issue, a reviewing court must determine if the agency's interpretation of the statute "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute."[14] Moreover, a reviewing court must accord the "view of the agency charged with administering the statute ... considerable deference."[15]
 
 
 32
 This deference, however, is only appropriate when the agency has exercised its own judgment. When, instead, the agency's decision is based on an erroneous view of the law, its decision cannot stand. As Justice Frankfurter explained in the landmark decision of SEC v. Chenery Corp.:[16]
 
 
 33
 If the action rests upon an administrative determination--an exercise of judgment in an area which Congress has entrusted to the agency--of course it must not be set aside because the reviewing court might have made a different determination were it empowered to do so. But if the action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law.[17]
 
 
 34
 There can be no doubt in this case that FERC did not exercise its own judgment in interpreting section 104. Instead, FERC believed itself bound by the Supreme Court's decision in Mid-Louisiana. In Order No. 391, for example, FERC stated that its interpretation was "in keeping with the Supreme Court's emphasis in Mid-Louisiana that the NGPA requires the Commission to treat production by a pipeline the same as production by a producer."[18] In its response to the Phillips Motion for Reconsideration, FERC even more unambiguously stated that it believed itself bound by Mid-Louisiana, saying that it believed that "the Mid-Louisiana decision requires parity treatment for producer and pipeline production."[19]
 
 
 35
 FERC's reading of Mid-Louisiana is simply wrong. In Mid-Louisiana, the Court held that the NGPA applied to the intracorporate transfer of pipeline-produced gas at the wellhead. Although, in so holding, the Court did discuss the NGPA's parity treatment of pipeline-company gas and independent-producer gas,[20] it most emphatically did not mandate FERC's current interpretation of section 104. Indeed, quite the contrary almost appears to be the case. The Court explicitly assumed that section 104 would freeze pipeline prices at the old cost-of-service level, and not at the national levels applicable to independent producers. The Court was faced with the argument--ironically made by FERC--that its holding would give pipeline producers a windfall. In response, the Court noted:
 
 
 36
 Finally, the Commission argues that pipeline producers would enjoy an unintended windfall if they received first sale pricing. This windfall argument is obviously limited to only one particular category of gas: gas already dedicated to interstate commerce on the date of enactment of the NGPA, and subject to cost-of-service pricing.[21]
 
 
 37
 In rejecting the windfall argument, the Court clearly appeared to be of a view that FERC would not set pipeline-gas prices at the same rate as producer gas, but rather would price the gas at its old NGA price:
 
 
 38
 This argument glosses over the full meaning of Congress' determination that old gas qualifies for "first sale" treatment. Under Sec. 104, such gas retains its former NGA price, subject to increases over time for inflation. Section 104 provides absolutely no opportunity for a windfall.[22]
 
 
 39
 The Supreme Court's discussion of this issue was clearly dicta. It was made in passing and without the benefit of briefing or argument. We thus do not view Mid-Louisiana as mandating the interpretation of section 104 urged by Phillips. However, by the same reasoning, the Mid-Louisiana decision can also in no way be read as mandating the Commission's interpretation of section 104.
 
 
 40
 We conclude, therefore, that FERC's construction cannot be sustained; quite simply, the Commission's interpretation was based solely on its erroneous reading of Mid-Louisiana. This case is thus closely analogous to this circuit's recent decision in Prill v. NLRB.[23] In Prill, we concluded that the National Labor Relations Board's new definition of "concerted activities" could not be sustained because the Board's definition was based on the faulty legal premise that the definition was mandated by the National Labor Relations Act. We remanded the case so that the Board could reconsider the scope of "concerted activities."[24] Here, FERC similarly concluded that its interpretation was mandated by Mid-Louisiana. Because the Commission's reading of that decision is erroneous, we remand for a reconsideration of the appropriate interpretation of section 104.
 
 
 41
 Arguably, a court might uphold FERC's current view of section 104 if the agency exercises its own judgment to resolve the ambiguities in the statute and offers a reasonable rationale for its interpretation. Section 104 of the Act sets the maximum lawful price at "the just and reasonable rate ... established by the Commission"[25] on April 20, 1977. The FPC, however, only "established" the national and regional rates for producer gas; the Commission set only the downstream rates charged to distributors for pipeline gas--not the wellhead rates at issue in this case--and in doing so, merely evaluated the "prudence" of pipelines' gas-production costs at the wellhead. As the FPC explained in one pipeline rate-making proceeding:
 
 
 42
 No just and reasonable rates are separately established for ... pipeline production.... [G]as costs including amounts paid to the special overriding royalty owners are subject to review for prudency in establishing ... pipeline [downstream] rates.[26]
 
 
 43
 There is at least a colorable argument, therefore, that the Commission never "established" any "just and reasonable rates" for the wellhead price of pipeline-produced gas.[27] Thus, it might be contended that the only available just and reasonable rates in April 1977 were the national rates set for independent-producer gas.
 
 
 44
 The difficulty with this line of argument, however, is that it places great importance on the parenthetical "or would have been" in the statute:
 
 
 45
 The maximum lawful price under this section for any month shall be the higher of--
 
 
 46
 (A)(i) the just and reasonable rate, per million Btu's, established by the Commission which was (or would have been ) applicable to the first sale of such natural gas on April 20, 1977....[28]
 
 
 47
 Because there was no just and reasonable rate "established by the Commission" that was "applicable" to pipeline gas on April 20, 1977, section 104 would only apply to the pipeline gas if the words "or would have been ... applicable" were intended to apply the national rates to pipeline-produced gas. Counsel for intervenor Midwest Energy, Inc., however, suggested in oral argument that this "or would have been" language was intended simply to fill a gap in the time period covered by the statute. Section 104 applies to any natural gas committed or dedicated to interstate commerce on November 8, 1978. For natural gas committed to interstate commerce after April 20, 1977 and before November 8, 1978, obviously no just and reasonable rate was applicable to the sale of gas on April 20, 1977. Thus, according to Midwest Energy, the "would have been" language was included merely to ensure that natural gas produced after April 20, 1977, but before November 8, 1978 was covered by section 104.
 
 
 48
 We express no opinion about the "correct" interpretation of section 104. We have discussed the competing interpretations of section 104 merely to illustrate the complex task forsaken by FERC when it incorrectly concluded that it was bound by Mid-Louisiana. On remand, FERC may construe section 104 so as to justify parity in rates, or it may otherwise interpret section 104; but, FERC may not assume that any particular construction is mandated by Mid-Louisiana.
 
 III. CONCLUSION
 
 49
 Under Chevron, reviewing courts accord deference to agency constructions of ambiguous statutes. Where, as here, however, an agency construction is not based on the agency's own judgment, but rather on an erroneous view of the law, the construction cannot be sustained. We remand the interpretation of section 104 to FERC in order that the Commission may reconsider the appropriate construction of section 104.
 
 
 50
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 291(a) (1982)
 
 
 [1]
 15 U.S.C. Sec. 3314(b)(1)(A)(i) (1982)
 
 
 [2]
 463 U.S. 319, 103 S.Ct. 3024, 77 L.Ed.2d 668 (1983)
 
 
 [3]
 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)
 
 
 [4]
 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943)
 
 
 [5]
 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954)
 
 
 [6]
 The statute defines "first sale" as follows:
 The term "first sale" means any sale of any volume of natural gas--
 (i) to any interstate pipeline or intrastate pipeline;
 (ii) to any local distribution company;
 (iii) to any person for use by such person;
 (iv) which precedes any sale described in clauses (i), (ii), or (iii);
 and
 (v) which precedes or follows any sale described in clauses (i), (ii), (iii), or (iv) and is defined by the Commission as a first sale in order to prevent circumvention of any maximum lawful price established under this Act.
 15 U.S.C. Sec. 3301(21)(A) (1982).
 
 
 [7]
 Id. Sec. 3314(b)(1)
 
 
 [8]
 463 U.S. 319, 103 S.Ct. 3024, 77 L.Ed.2d 668 (1983)
 
 
 [9]
 FERC Order No. 391, Production Under Section 2(21) of the Natural Gas Policy Act of 1978, 49 Fed.Reg. 33,849 (1984) [hereinafter cited as Order No. 391] states in relevant part:
 If the pipeline's gas was committed or dedicated to interstate commerce before the date of enactment of the NGPA and a cost-of-service determination was in effect for that gas, the pipeline's production division should price such gas at the appropriate NGPA section 104 rate....
 This interpretation is in keeping with the Supreme Court's emphasis in Mid-Louisiana that the NGPA requires the Commission to treat production by a pipeline the same as production by a producer.
 Id. at 33,852.
 
 
 [10]
 FERC Order No. 391-A, Production Under the Natural Gas Policy Act of 1978; Order Denying Rehearing and Clarifying Final Rule, 50 Fed.Reg. 14,374 (1985) [hereinafter cited as Order No. 391-A]
 
 
 [11]
 Id. at 14,378
 
 
 [12]
 Warth v. Seldin, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 2204-05, 45 L.Ed.2d 243 (1975) (quoting Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962))
 
 
 [13]
 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)
 
 
 [14]
 Id. at 845, 104 S.Ct. at 2783 (quoting United States v. Shimer, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961))
 
 
 [15]
 Chemical Manufacturers Ass'n v. Natural Resources Defense Council, Inc., 470 U.S. 116, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985)
 
 
 [16]
 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943)
 
 
 [17]
 Id. at 94; 63 S.Ct. at 462; see also Prill v. NLRB, 755 F.2d 941, 947-48 (D.C.Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 313, 88 L.Ed.2d 294 (1985); White v. United States Dep't of the Army, 720 F.2d 209, 210-11 (D.C.Cir.1983); Planned Parenthood Federation of America, Inc. v. Heckler, 712 F.2d 650, 666 (D.C.Cir.1983) (Bork, J., concurring in part, dissenting in part); Diplomat Lakewood Inc. v. Harris, 613 F.2d 1009, 1018-19 (D.C.Cir.1979)
 
 
 [18]
 Order No. 391, 49 Fed.Reg. at 33,852 (emphasis added)
 
 
 [19]
 Order No. 391-A, 50 Fed.Reg. at 14,378 (emphasis added)
 
 
 [20]
 The Court, for example, emphasized that the NGPA does not distinguish between gas on the basis of who produces it:
 For the usefulness of natural gas does not depend on who produces it, and there is no reason to believe that any one group of producers is less likely to respond to incentives than any other.
 463 U.S. at 336-37, 103 S.Ct. at 3034.
 
 
 [21]
 Id. at 341, 103 S.Ct. at 3037
 
 
 [22]
 Id. at 341-42, 103 S.Ct. at 3037 (emphasis added)
 
 
 [23]
 755 F.2d 941 (D.C.Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 313, 88 L.Ed.2d 294 (1985)
 
 
 [24]
 Id. at 942
 
 
 [25]
 15 U.S.C. Sec. 3314(b)(1)(A)(i) (1982) (emphasis added)
 
 
 [26]
 El Paso Natural Gas Co., 57 F.P.C. 989, 1001 (1977); see also Pierce, Reconsidering the Roles of Regulation and Competition in the Natural Gas Industry, 97 Harv.L.Rev. 345, 349-50 (1983) (explaining that cost-of-service methodology was used to establish "[r]ates charged gas distributors" with gas acquisition expenses treated as "costs")
 
 
 [27]
 Because gas acquisition and production costs were evaluated for reasonableness, however, it would not be a difficult task to determine a reconstructed "rate" at which these expenses at the wellhead were passed on to the ultimate consumers
 
 
 [28]
 15 U.S.C. Sec. 3314(b)(1) (1982) (emphasis added)