**Diane ZARR, Plaintiff/Appellant,**

v.

**Earl BARLOW, Director, Office of Indian Education Programs, Bureau of Indian Affairs, et al., Defendants/Appellees.**

**No. 85–2170.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 14, 1986.

Decided Sept. 30, 1986.

Stephen V. Quesenberry, California Indian Legal Services, Ukiah, Cal., for plaintiff/appellant.

John T. Stahr, Dept. of Justice, Washington, D.C., for defendants/appellees.

Before SCHROEDER, CANBY, and BOOCHEVER, Circuit Judges.

BOOCHEVER, Circuit Judge:

Diane Zarr is an enrolled member of the Sherwood Valley Band of Pomo Indians, a federally recognized Indian tribe.[1] She is certified by the Bureau of Indian Affairs ("BIA" or "the government") as having 7/32d degree Indian blood. She applied to the BIA for Indian higher education grants, but her application was denied because she does not meet the eligibility criterion under 25 C.F.R. § 40.1 (1986), which provides that an applicant must possess an Indian blood quantum of at least one-quarter degree to be eligible. After exhausting her administrative remedies, she brought this action in the district court to compel the agency to authorize the grant. Zarr contends that the application of the regulation to her

---

1. As a member of a federally recognized tribe, Zarr satisfies the definition of "Indian" and is eligible to participate in the vast majority of BIA programs, including, for example, the programs and services provided under the following statutes and regulations: 25 U.S.C. § 450b(a) (Indian Self-Determination and Education Assistance Act); 25 U.S.C. § 1603(c) (Indian Health Care Improvement Act); 25 U.S.C. § 1452(b) (Indian Financing Act); 25 U.S.C. § 1903(3) (Indian Child Welfare Act); 25 U.S.C. § 479 (Indian Reorganization Act) (as amended by 25 U.S.C. § 1452, Indian Financing Act of 1974); 25 C.F.R. § 5.1(a) (Indian Preference in Employment); 25 C.F.R. § 32.2(m) (Indian Education Policies); 25 C.F.R. § 41.3(h) (Grants to Tribally Controlled Community Colleges); 25 C.F.R. § 26.1(g) (Employment Assistance for Adult Indians).

violates her right to equal protection and that the regulation was invalidly promulgated. The district court granted summary judgment for the government.

We are confronted with the question of the present validity of an administrative regulation's eligibility standard, when the statute under which the standard was purportedly promulgated has been amended to provide a more inclusive standard of eligibility. We hold that the BIA's continued restrictive application of the one-quarter degree Indian blood standard is not in accordance with the law, and we reverse.

## Standard of Review

A grant of summary judgment is reviewed de novo. *Ashton v. Cory*, 780 F.2d 816, 818 (9th Cir.1986). The reviewing court must determine whether there is any genuine issue of material fact and whether the substantive law was correctly applied. *Id.*

"Prior to reaching any constitutional questions, federal courts must consider nonconstitutional ground[s] for decision." *Jean v. Nelson*, —— U.S. ——, 105 S.Ct. 2992, 2997, 86 L.Ed.2d 664 (1985) (citations omitted). This is a fundamental rule of judicial restraint. *Id.* at 2998 (citing *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, P.C.*, 467 U.S. 138, 104 S.Ct. 2267, 81 L.Ed.2d 113 (1984)). Thus, we first consider Zarr's challenge to the BIA's promulgation of the regulation.

 A challenged regulation will be set aside if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). In determining whether agency action is arbitrary or capricious, the reviewing court must determine whether there has been a clear error of judgment and whether the agency action was based on a consideration of the relevant factors. *Nance v. Environmental Protection Agency*, 645 F.2d 701, 705 (9th Cir.), *cert. denied*, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981). In

addition, an administrative regulation must fall within the authority conferred by Congress on the administering agency. *Chrysler Corp. v. Brown*, 441 U.S. 281, 308, 99 S.Ct. 1705, 1720, 60 L.Ed.2d 208 (1979). Such grant of authority need not be specific: "What is important is that ... the grant of authority contemplates the regulations issued." *Id.* The regulation needs to be reasonably related to the purposes of the enabling legislation. *California v. Block*, 663 F.2d 855, 860 (9th Cir.1981).

Administrative agencies are entitled to great deference in interpreting statutes under their authority. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). To sustain the regulation, the court "need not find that its construction is the only reasonable one, or even that it is the result [the court] would have reached had the question arisen in the first instance in judicial proceedings." *Id.* (quoting *Unemployment Compensation Commission of Alaska v. Aragon*, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946)). The regulation need only be "a reasonable interpretation" of the relevant statute. *Aluminum Co. of America v. Central Lincoln Peoples' Utility District*, 467 U.S. 380, 389, 104 S.Ct. 2472, 2479, 81 L.Ed.2d 301 (1984).

 On the other hand, in order for an agency interpretation to be granted deference, it must remain consistent with congressional purpose. *See Morton v. Ruiz*, 415 U.S. 199, 232 & 237, 94 S.Ct. 1055, 1073 & 1075, 39 L.Ed.2d 270 (1974). Finally, acts passed for the benefit of Indians must be liberally construed, with doubtful or ambiguous expressions resolved in the Indians' favor. *Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976).

## 1. 25 U.S.C. § 471

Zarr's application for a higher education grant was denied by the BIA for failure to meet the eligibility requirements of 25 C.F.R. § 40.1, which provides that:

[f]unds appropriated by Congress for the education of Indians may be used for making educational loans and grants to aid students of one-fourth or more degree of Indian blood attending accredited institutions of higher education or other accredited schools offering vocational and technical training who reside within the exterior boundaries of Indian reservations under the jurisdiction of the [BIA]....[2]

Zarr contends that this regulation was promulgated and is administered without congressional authorization or ratification, and that it is not in accordance with law. The BIA relies on a number of statutes for direct and indirect authority for the promulgation and administration of the one-quarter degree Indian blood restriction. We first look to the administrative regulation and its enabling legislation to determine whether the regulation falls within the authority conferred upon the administering agency, *Chrysler Corp. v. Brown,* 441 U.S. at 302, 99 S.Ct. at 1717, and whether the regulation is reasonably related to the purposes of the enabling legislation. *California v. Block,* 663 F.2d at 860.

Title 25 C.F.R. Part 40, which includes the challenged regulation, section 40.1, is entitled "ADMINISTRATION OF EDUCATIONAL LOANS, GRANTS AND OTHER ASSISTANCE FOR HIGHER EDUCATION." Section 40.1's predecessor, which contained the identical one-quarter degree Indian blood eligibility requirement, was first promulgated in 1957 as section 32.1 of Title 25. 22 Fed.Reg. 10,533 (1957). An introductory note denominated "AUTHORITY" preceding section 32.1 express-

ly states that the regulation was promulgated under authority of 25 U.S.C. § 471.[3] Part 40 continues to cite 25 U.S.C. § 471 as its enabling authority.

Section 471 was enacted by Congress on June 18, 1934 as part of the comprehensive Indian Reorganization Act, 25 U.S.C. §§ 461–479 (1982), and provides simply for the appropriation of a sum of money "for loans to Indians for the payment of tuition and other expenses in recognized vocational and trade schools." We observe that section 471 appropriates moneys for loans; nowhere in that section is there an appropriation for or an authorization of expenditure of moneys for grants. Likewise, subsequent acts of amendatory legislation affecting expenditures of moneys under section 471 refer only to loans. *See, e.g.,* 25 U.S.C. § 482 (Act of May 7, 1949—revolving loan fund); 25 U.S.C. § 1461 (Indian Financing Act—same). Thus it would seem from the plain language of section 471 that the provision does not confer authority upon the BIA to distribute moneys for higher education grants.

■ Nevertheless, we find congressional authority for the grant program. Even if section 471 does not authorize expenditure of moneys for educational grants, the Snyder Act, 25 U.S.C. § 13, provides sufficient authority for the Secretary to spend money for educational programs that would encompass higher education grants. The Snyder Act "provides the underlying congressional authority for most BIA activities," *Morton v. Ruiz,* 415 U.S. at 205–06, 94 S.Ct. at 1059–60, and provides in part:

---

**2.** The regulation continues:
Such educational loans and grants may be made also to students of one-fourth or more degree of Indian blood who reside near the reservation when a denial of such loans or grants would have a direct effect upon Bureau programs within the reservation. After students meeting these eligibility requirements are taken care of, Indian students who do not meet the residency requirements but are otherwise eligible may be considered.
25 C.F.R. § 40.1 (1986). Thus, an Indian student of one-quarter degree blood quantum living far off the reservation beyond the residency

criterion would become eligible for a higher education grant if funding permitted, while an Indian student of 7/32 degree blood quantum living on the reservation could never become eligible.

**3.** Section 32.1 was amended in part in 1968, 33 Fed.Reg. 9708 (1968). However, that amendment did not involve the challenged blood quantum requirement, which has continued into the present section 40.1. *See* 47 Fed.Reg. 13,327 (1982) (25 C.F.R. § 32.1 redesignated section 40.1).

The Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys as Congress may ... appropriate, for the benefit, care, and assistance of the Indians throughout the United States for the following purposes: General support and civilization, including education.

. . . . .

25 U.S.C. § 13 (enacted Nov. 2, 1921) (emphasis added). Indeed, the Secretary now relies, in part, on the Snyder Act for the promulgation of the one-quarter degree Indian blood requirement. We shall address those arguments in Part 2 of our opinion. For present purposes, we hold that the BIA's incorrect citation of 25 U.S.C. § 471 as authorizing a regulation for a grant program is not fatal to the validity of the regulation where the authority is manifest in another statute.

This conclusion does not resolve the question of the one-quarter degree Indian blood requirement, however, for aside from the broadly inclusive "Indians throughout the United States" provision, the Snyder Act contains no additional definition of who is considered an eligible Indian for Snyder Act purposes. Nor does this conclusion make further discussion of section 471 unnecessary. The BIA has twice cited that section for authority in promulgating the challenged regulation, and we believe it did so for a reason. Further, the BIA continues to rely on section 471 in its briefs. Thus, we next examine the history of section 471 to ascertain whether that section now provides authority for the BIA's requirement of a one-quarter degree Indian blood eligibility restriction.

There is no definition in section 471 of who is an Indian, nor is there an eligibility criterion contained in that section. Section 479 of the Indian Reorganization Act does provide a definition, however, and states that

[t]he term "Indian" as used in section[ ] ... 471 ... of this title shall include all persons of Indian descent who are members of any recognized Indian tribe now

under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood.

25 U.S.C. § 479. As a person of Indian descent who is a member of a recognized tribe, Zarr qualifies under this definition.

On May 10, 1939, section 480 was added, providing that

[o]n and after May 10, 1939 no individual of less than one-quarter degree of Indian blood shall be eligible for a loan from funds made available in accordance with the provisions of section[ ] ... 471....

25 U.S.C. § 480. Further, in May 1948, Congress created a revolving loan fund, which authorized the Secretary to prescribe regulations to make loans from the funds established under the Indian Reorganization Act of 1934, "Provided, That no portion of these funds shall be loaned to Indians of less than one-quarter Indian blood." 25 U.S.C. § 482.

Thus, it is clear that until May 1939, an Indian of Zarr's blood quantum would have been included within Congress' definition of an eligible Indian for programs administered under section 471. It is also clear that after May 1939, under section 480, an Indian of $7/32$d degree blood quantum would be excluded from any program operating under the authority of section 471. Therefore, when the BIA promulgated the predecessor regulation to 25 C.F.R. § 40.1 in 1957, it was clearly acting within the scope of the authority granted by Congress in restricting loans to Indians of one-quarter or more degree Indian blood.

It would also have been reasonable in 1957 for the BIA to rely on congressional approval of a one-quarter degree Indian blood restriction as expressed in 25 U.S.C. §§ 480 and 482 for restricting grants to Indians of one-quarter blood or more. Although the BIA could not promulgate a grant program under section 471, which only authorizes loans, the grant program

would survive under the authority granted by the Snyder Act. The BIA could not look to the Snyder Act for a one-quarter degree Indian blood restriction, however, for that act contains no such restriction. Section 471, as amended by sections 480 and 482, does provide authority for a one-quarter degree Indian blood restriction, so the BIA could reasonably rely on section 471 and its amendatory legislation to restrict higher education grants to Indians of one-quarter or more degree Indian blood. The rational is based on the recognition that the

> power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress. In the area of Indian affairs, the Executive has long been empowered to promulgate rules and policies, and the power has been given explicitly to the Secretary and his delegates at the BIA.

*Morton v. Ruiz*, 415 U.S. at 231, 94 S.Ct. at 1072 (footnotes omitted); *see also* 25 U.S.C. §§ 9, 2 (1982). The Snyder Act nowhere contains a definition of Indian or any restrictive eligibility standard; therefore, it would have been reasonable for the BIA to look to other expressions of congressional intent in formulating an eligibility standard to "fill the gap." This does not end the analysis, however, for agency power to make rules carries with it the responsibility to remain consistent with governing legislation, *Morton v. Ruiz*, 415 U.S. at 232, 94 S.Ct. at 1073, and as we discuss, Congress has since changed the governing legislation.

In April 1974, Congress enacted the Indian Financing Act, 25 U.S.C. §§ 1451–1543 (1982). Section 1461 of the Financing Act provides for the administration under a single Indian Revolving Loan fund of a number of separate Indian financing programs, including programs authorized under the Indian Reorganization Act of 1934 (which includes 25 U.S.C. § 471). Section 1462 specifically authorizes loans for education purposes. 25 U.S.C. § 1462. Section 1452 of the Indian Financing Act provides definitions:

> For the purpose of this chapter, the term—
>
> (b) "Indian" means **any person who is a member of any Indian tribe** ... which is recognized by the Federal Government as eligible for services from the Bureau of Indian Affairs....

25 U.S.C. § 1452 (emphasis added).[4] Thus, section 471 Indian loan programs were brought under the single umbrella revolving loan fund, and for purposes of that program, which includes provision for educational loans, the term "Indian" was redefined to mean any person who is a member of a federally recognized tribe. It is clear that after 1974, Congress intended that persons like Zarr, who are enrolled members of a federally recognized tribe, should be eligible to participate in programs promulgated under the authority of the enumerated sections, including section 471. *Hughes Air Corp. v. Public Utilities Commission*, 644 F.2d 1334, 1337 (9th Cir.1981) (to determine the intent of Congress, courts must look first to the plain meaning of the statute).

The legislative history of the 1974 Indian Financing Act supports this conclusion and demonstrates that Congress intended to establish a uniform statutory standard for administering BIA loan funds.

> Title I [of the Indian Financing Act] consolidates the four existing Indian revolving loan funds administered by the Bureau of Indian Affairs.... **It additionally provides a statutory structure for the programs, most of which is [sic] currently implemented through administrative rules and regulations.**

H.R.Rep. No. 907, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Ad. News 2873, 2875 (emphasis added).

The BIA attempts to dismiss the effect of the Indian Financing Act of 1974[5] by

---

4. Zarr is clearly an Indian under this definition. *See supra* note 1.

5. Although the BIA failed to amend the challenged regulation to account for Congress' new

asserting that this legislation did not specifically repeal the blood quantum eligibility standards established by sections 480 and 482.[6] This argument is specious, for the plain meaning and clear intent of the language contained in section 1452 is to redefine who is an "Indian" for purposes of consolidating the administration of numerous funding programs under the Indian Financing Act's uniform standard. This conclusion is obvious, whether we construe the Indian Financing Act as an amendment to or as an implied repeal of inconsistent provisions of the Indian Reorganization Act. *See* 1A N. Singer, *Sutherland Statutory Construction*, §§ 22.22, 22.30 (C. Sands 4th ed. 1985).

■ The BIA also contends that sections 471, 480, and 482 read together remain the source of authority for the blood quantum standard promulgated in 25 C.F.R. § 40.1. Again, this construction ignores the plain language and intent of the Indian Financing Act, and the agency is not free to ignore the statute and continue to administer the various loan programs under whatever standard it believes is correct or expedient. An agency's power to make rules that affect substantial individual rights carries with it the responsibility to remain consistent with governing legislation, *Morton v. Ruiz*, 415 U.S. at 232, 94 S.Ct. at 1073, and the BIA's eligibility standard is no longer consistent with that of Congress.

The BIA further argues that even if loan eligibility can no longer be based upon one-fourth blood degree pursuant to the Indian Financing Act, it is reasonable to base eligibility for outright grants, which have no payback requirements, on the more restrictive standard. We note, however, that the express language of the BIA's regulation

establishes a one-quarter degree blood quantum eligibility criterion for both "educational loans and grants." 25 C.F.R. § 40.1. The BIA was aware of the import of congressional redefinition of an eligible Indian for educational loans, *see supra* note 5, but the agency did not correct the outmoded eligibility standard for "educational loans and grants" contained in 25 C.F.R. § 40.1. Moreover, to the extent that the BIA is relying on 25 U.S.C. § 471, its argument fails because section 471 and its amendatory provisions do not authorize grants. To the extent that the agency relies on the Snyder Act, the Snyder Act itself contains no restrictive eligibility standards, and the BIA has not expressly promulgated a one-quarter degree Indian blood standard for such a Snyder Act program. *See infra* Part 2. Further, the BIA does not offer any explanation why such a construction is reasonable, or how making distinctions based upon differing degrees of blood quanta among Indians who are members of federally recognized tribes furthers Congress' intent as expressed in the 1974 Indian Financing Act concerning expenditure of moneys appropriated for the benefit of Indians.

■ To summarize, the BIA promulgated the challenged regulation under 25 U.S.C. § 471, and that statute comes under the Indian Financing Act's coverage, including its definition of who is an Indian for purposes of the Act. The BIA's more restrictive definition of who is an Indian eligible to participate in the higher education grant program, although valid when the regulation was first promulgated in 1957, is now contrary to Congress' definition.[7] Therefore, the BIA's eligibility stan-

---

eligibility standards for educational loans to Indians, it is evident that the agency understood that a new, more inclusive standard was required under the Indian Financing Act. The BIA promulgated a new Part 101 under the authority of the 1974 Indian Financing Act, which, in part, authorizes direct educational loans to individual Indians. 25 C.F.R. §§ 101.-2(b)(3) and (4). The BIA defined an eligible Indian as "any person who is a member of any Indian tribe ... which is recognized by the Federal Government as eligible for services

from the [BIA]." 25 C.F.R. § 101.1(c). *See supra* note 4.

**6.** The BIA fails to note that neither sections 480 nor 482 specifically repealed the more inclusive definition of "Indian" found in section 479.

**7.** The BIA's definition is also not internally consistent with its own regulations concerning other vocational training programs. *Compare* 25 C.F.R. Part 27, Vocational Training for Adult Indians, which defines an "Indian" for purposes

dard does not fall within the current authority conferred by Congress. To the contrary, the regulation defeats the congressional purpose expressed in the 1974 Indian Financing Act of redefining eligible Indians under a more inclusive standard and establishing a statutory structure for programs previously implemented through administrative rules and regulations. Thus, we hold that the regulation is not in accordance with the governing legislation.

### 2. The Snyder Act

The BIA next contends that the Secretary acted within his authority under the Snyder Act, 25 U.S.C. § 13, in rejecting Zarr's application. The BIA argues that the grant program to which Zarr applied is a Snyder Act program. Although we have held that the BIA could have promulgated the grant program under the Snyder Act, we do not necessarily conclude that the BIA in fact relied on the Snyder Act in promulgating the one-quarter degree Indian blood restriction. As discussed in Part 1, *supra*, the BIA cites the Indian Reorganization Act of 1934, 25 U.S.C. § 471, not the Snyder Act, as its source of authority in promulgating 25 C.F.R. Part 40. When the BIA intends to promulgate regulations under the Snyder Act, it knows how to do so. *Compare* 25 C.F.R. Part 20, FINANCIAL ASSISTANCE AND SOCIAL SERVICES PROGRAM, which specifically cites the Snyder Act, 25 U.S.C. § 13, for its source of authority.[8] The BIA's reliance on the Snyder Act is a post hoc attempt to supply a foundation for the agency's regulation. Although we give deference to administrative agencies when they interpret statutes and regulations under their authority, *Udall v. Tallman,* 380 U.S. at 16, 85 S.Ct. at 801, in this case we must give at least equal, if not controlling, deference to the agency's express recitation of the source of its authority when it first promulgated the regulation.

In buttressing its Snyder Act argument, the BIA contends that "Congress' own use of a one-fourth blood degree standard for Indian educational assistance [in] 25 U.S.C. § 297 demonstrates that the Secretary's promulgation of the identical standard under the Snyder Act is reasonable." Section 297 does impose limitations on expenditures to educate children "of less than one-fourth Indian blood," but it applies only to expenditures in BIA Indian day schools. 25 U.S.C. § 297 (enacted May 25, 1918). In the district court, the BIA argued that section 297 was "[f]oremost among the statutes requiring a one-quarter Indian blood degree," and that "this eligibility standard is likewise required by § 297 to apply to all appropriations 'used to educate' otherwise eligible Indians." (Emphasis by BIA). On appeal, however, the BIA correctly "do[es] not contend ... that 25 U.S.C. 297 provides direct authority for promulgation of Indian higher education grant [one-quarter degree] eligibility standards." It is clear that section 297 is inapplicable to Indian higher education grant programs.

Of greater import, on December 28, 1985, Pub.L. No. 99-228 was enacted, repealing section 297 and its one-quarter degree Indian blood standard. 25 U.S.C.A. § 297 (West Supp.1986). In its stead, Congress amended 25 U.S.C. § 2008(f) to provide:

> In this section "eligible Indian student" means a student who—
>
> (1) is a member of or is at least a ¼ degree Indian blood descendant of a member of an Indian tribe which is eligi-

---

8. Interestingly, for this Snyder Act program, "'Indian' means any person who is a member, or a one-fourth degree or more blood quantum descendant of a member of any Indian tribe." 25 C.F.R. § 20.1(n) (emphasis added). *Accord,* 25 C.F.R. Part 256, HOUSING IMPROVEMENT PROGRAM, § 256.2(e) (another specifically cited Snyder Act program, defining Indian either as an enrolled member or of one-half or more degree Indian ancestry).

of that program to mean "any person of Indian or Alaska native descent who is an enrolled member of any of those tribes listed ... as recognized by and receiving services from the Bureau of Indian Affairs or a descendant of one-fourth degree or more Indian blood of an enrolled member...." 25 C.F.R. § 27.1(i) (emphasis added).

ble for the special programs and services provided ... through the Bureau of Indian Affairs....

25 U.S.C.A. § 2008(f) (West Supp.1986) (emphasis added).

The legislative history of this repeal and amendment convincingly reveals that Congress now rejects, if it had not done so earlier, a single one-quarter degree Indian blood eligibility restriction. The remarks accompanying the bill's introduction demonstrate that Congress is concerned that a one-quarter degree blood quantum without more is an impermissible racial classification. The bill's sponsor made the following remarks:

I introduced this bill for various reasons, including the fact that **for all BIA services, except education, membership in a federally recognized tribe is the sole criteria for eligibility.** Second, the Congress has passed at least six major acts since 1918 dealing with education or eligibility for services and in each of those tribal membership is the criteria. It simply makes no sense now to change a practice that has continued for over half a century in a way that will **discriminate, by race,** against certain children, and to use as justification **an old law that has been repealed by implication on at least six occasions.**

131 Cong.Rec. 17,649 (1985) (statement by Senator Melcher introducing S. 1621) (emphasis added). *See also* S.Rep. No. 180, 99th Cong., 1st Sess. 1, *reprinted in* 1985 U.S. Code Cong. & Ad. News 2672 ("S. 1621 is intended to bring consistency to the eligibility criteria used for BIA programs."). Thus, it is clear that 25 U.S.C. § 297 cannot serve to justify continued application of the challenged regulation.

Even if the Snyder Act, considered broadly, can be construed as additional or alternative authority for the challenged regulation, we believe that it cannot be construed to provide authority for the continued use of the one-quarter degree Indian blood eligibility requirement in this case. Assuming that the BIA relied sub silentio on the Snyder Act to authorize higher education grants when it first promulgated 25 C.F.R. Part 40, it appears that the agency looked to 25 U.S.C. § 471 for authorization of the restrictive one-quarter degree Indian blood standard. As we have discussed, the BIA could not have looked to the Snyder Act for a restrictive definition or eligibility standard, for it contains none.

Where Congress has determined to make Indian blood quantum an eligibility factor in the past, it has expressly so provided. *See, e.g.,* 25 U.S.C. § 297. It did not do so in the Snyder Act, and we refuse to construe its general language authorizing appropriations for educational assistance for "the Indians throughout the United States" as authority to continue restrictive distinctions among members of federally recognized tribes. To make such a construction would be at odds with recent expressions of congressional intent to establish a uniform inclusive standard for BIA funded programs, as manifested by the Indian Financing Act, and particularly with respect to Indian education programs, *e.g.,* Pub.L. No. 99–228. In the absence of express language in the Snyder Act demonstrating that Congress intended to make distinctions among Indians who are tribal members but who have different degrees of Indian blood, it would thwart every indication of congressional intent to permit the BIA to rely on its power to "fill any gap left" by Congress, *Morton v. Ruiz,* 415 U.S. at 231, 94 S.Ct. at 1072, to support its use of the discredited restrictive standard.

Such a construction would also be at odds with the BIA's other Snyder Act programs. Where the BIA has promulgated regulations expressly on the authority of the Snyder Act, it has used an enrolled membership or alternatively an Indian blood standard. *See supra* note 8. We observe that the BIA itself, in an analogous context, has recently rejected the limiting one-quarter criterion in favor of a more inclusive eligibility standard, by defining an Indian as a person "who is an enrolled member ... or a descendant of one-fourth degree or more Indian blood of an enrolled member and any person not a member of the ... tribes who possesses at least one-half degree of Indian blood...."

25 C.F.R. § 27.1(i) (1986) (emphasis added) in Part 27, VOCATIONAL TRAINING FOR ADULT INDIANS. The BIA explained that "Paragraph (i) of sec. 27.1, definition of 'Indian', has been changed to conform to the **most recent standard Bureau definition.**" 49 Fed.Reg. 2100 (1984) (emphasis added). *See also supra* notes 1, 7, and 8. There is no logical explanation why an antiquated standard should apply to Zarr.

■ Finally, to the extent that there is any ambiguity concerning the interpretation and co-application of the 1921 Snyder Act, the 1934 Indian Reorganization Act, the 1974 Indian Financing Act, and the 1985 repeal of 25 U.S.C. § 297 and the amendment of section 2008(f), the ambiguity should be resolved in favor of including all enrolled members of recognized Indian tribes within the grant program. *See Bryan v. Itasca County,* 426 U.S. at 392, 96 S.Ct. at 2112; *see also Wilson v. Watt,* 703 F.2d 395, 402 (9th Cir.1983) (general assistance program under Snyder Act is for "special benefit of Indians and must be liberally construed in their favor"). Such a construction is consistent both with other Snyder Act and Indian Reorganization Act programs, and with recent congressional action. We therefore hold that the Snyder Act does not provide authority for the continued application of the one-quarter degree Indian blood quantum eligibility requirement of 25 C.F.R. § 40.1.

### 3. Congressional Ratification

■ The BIA also contends that Congress has ratified the one-quarter degree Indian blood standard through eleven years of appropriation acts based upon Interior Department budget requests which explicitly cited the one-quarter degree standard.

This court has held that "[t]he mere appropriation of funds, however, does not constitute congressional ratification...." *Rincon Band of Mission Indians v. Harris,* 618 F.2d 569, 573 (9th Cir.1980). "Ratification by appropriation will not be found unless the government has sustained 'the heavy burden of demonstrating congressional knowledge of the precise course of action alleged to have been acquiesced

in.'" *Id.* (quoting *City of Santa Clara v. Andrus,* 572 F.2d 660, 672 (9th Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978)). Moreover, the appropriation must plainly show a purpose to bestow the precise authority which is claimed. *Id.* at 573.

The government has not shown that Congress was actually aware of the one-quarter degree blood quantum, much less that it intended to approve that quantum. There is no evidence of congressional hearings or findings discussing, approving, or even acquiescing in the promulgation standard; there is no indication that Congress ever discussed that particular regulation or the Department's budget requests. There is contrary evidence, however, that Congress rejects the one-quarter standard in favor of a membership in a recognized tribe standard. Indian Financing Act of 1974, 25 U.S.C. § 1452; Pub.L. No. 99–228. We hold that the government has not met its "heavy burden" of showing congressional ratification by appropriation.

### 4. Attorneys Fees

■ Zarr seeks attorneys fees under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412 (West Supp.1986). Although we hold that the government's promulgation of the one-quarter degree Indian blood eligibility requirement was beyond the authority conferred by Congress, we do not believe that the government's position was not "substantially justified" as would be required in order to award attorneys fees under section 2412(d)(1)(A). Therefore, although we recognize the value of the service that Zarr has rendered to her fellow Indians of less than one-quarter degree blood, we are not free to award attorneys fees under the EAJA.

### Conclusion

We hold that neither the Indian Reorganization Act, 25 U.S.C. § 2471, as amended by the Indian Financing Act, 25 U.S.C. § 1452, nor the Snyder Act, 25 U.S.C. § 13, provides authority for the BIA's continued application of a one-quarter degree Indian blood quantum eligibility requirement for Indian higher education grants under 25

**1494**

C.F.R. § 40.1. In view of the 1974 Indian Financing Act, the regulation makes unauthorized distinctions among Indians who are members of federally recognized tribes and have differing amounts of Indian blood. Nor did Congress ratify the one-quarter degree blood quantum eligibility standard.

Because we conclude that the regulation falls outside of the authority conferred on the BIA, and that it is not reasonably related to the purposes of the various congressional enabling acts, we do not reach Zarr's trust obligation and equal protection arguments. Because the district court's grant of summary judgment was predicated upon the validity of the one-quarter degree Indian blood eligibility standard which we hold invalid, we reverse and remand for further proceedings not inconsistent with this opinion.

REVERSED and REMANDED.