Greg MALONE;  Gene Malone,
Plaintiffs–Appellants,

v.

BUREAU OF INDIAN AFFAIRS,
et al., Defendants–Appellees.

No. 93–15011.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 16, 1994.

Decided Oct. 11, 1994.

Stephen V. Quesenberry, California Indian Legal Services, Oakland, CA, David J. Rapport, Rapport & Marston, Ukiah, CA, for plaintiffs-appellants.

Edward J. Shawaker and Catherine Shea-for, U.S. Dept. of Justice, Washington, DC, for defendants-appellees.

Patrice Kunesh, Native American Rights Fund, Boulder, CO, for amicus.

Before: D.W. NELSON and BEEZER, Circuit Judges, and LETTS,* District Judge.

## OPINION

D.W. NELSON, Circuit Judge:

Greg and Gene Malone are members of the Wintun Indian Tribe in California. After they were denied higher education grants by the Bureau of Indian Affairs ("BIA"), they initiated this action in federal district court, seeking a declaration that the BIA's administration of the Higher Education Grant Program violated the Administrative Procedure Act ("APA"), and an order enjoining the BIA from refusing to consider them eligible for grants.

In a decision dated December 8, 1992, the district court granted summary judgment to the BIA on the ground that, although the Malones are more than one-quarter Indian by blood and thus eligible for grants pursuant to the only published eligibility criterion, the Ninth Circuit invalidated that criterion in *Zarr v. Barlow*, 800 F.2d 1484 (1986). The district court concluded that the *Zarr* decision, interpreting the interplay of a number of federal statutes that provide for the assistance of Indians, mandates that the BIA make grant eligibility contingent on membership in a federally recognized tribe, and precludes any other basis for determining eligibility.

On appeal, the Malones do not claim that the Wintun Tribe is federally recognized. Instead, they argue that both the BIA and the district court are misreading *Zarr*, and that, after *Zarr*, although the BIA must consider all members of federally recognized tribes eligible for grants, it also must continue to award grants to other Indians with one-quarter or more Indian blood.

We have jurisdiction under 28 U.S.C. § 1291. We conclude that neither the district court nor the parties to this appeal correctly read *Zarr*. *Zarr* invalidated the existing eligibility criterion for the Higher Education Grant Program, and did not dictate the precise standard that the BIA should adopt in its stead. When the holding of *Zarr* is properly understood, it follows directly that the BIA violated the APA in adopting a new set of written eligibility criteria without following the notice and comment rulemaking procedures specified in the APA. It also follows directly from *Zarr*, however, that the promulgation of appropriate grant program eligibility criteria remains the exclusive province of the BIA. Lacking the authority to dictate what criteria the BIA should adopt, we affirm the district court's denial of injunctive relief to the Malones.

## FACTUAL BACKGROUND

All facts relevant to the district court's grant of summary judgment are undisputed. The following brief overview is taken from the district court's decision:

Plaintiffs, brothers Gene and Greg Malone, are both five-sixteenths Wintun Indian. Gene applied for and received a BIA Higher Education Grant in 1982. In the fall of 1988, Gene again applied for a grant but the Area Education Program Administrator denied his application on the ground that the Wintun Tribe is not federally recognized. Gene successfully appealed the administrator's decision to Wilson I. Babby, Deputy to the Assistant Secretary of Indian Affairs. Babby determined that, since Gene was previously funded, he should be funded for the 1988–89 school year.

Greg applied for a BIA grant in the fall of 1989. The administrator denied Greg's application—again, because Greg is not a member of a federally recognized tribe. Greg's administrative appeal was denied on March 13, 1991. In spite of Babby's decision to fund Gene for the 1988–89 school year, Gene's application for the 1990–91 academic year was also denied. Gene did not appeal the decision because, in denying Greg's appeal, the new Deputy

* The Honorable J. Spencer Letts, United States District Judge for the Central District of California, sitting by designation.

to the Assistant Secretary of Indian Affairs, Dennis R. Fox, stated that Gene had been mistakenly funded and that the BIA planned to terminate his grant.

Plaintiffs filed a complaint [in federal district court] on February 7, 1992, seeking review of the BIA's decisions denying their applications for grants. The complaint seeks a declaration that plaintiffs are entitled to educational grants and an injunction preventing defendants from denying educational grants to Indians who are one-quarter degree Indian blood quantum, but who are not members of federally recognized tribes.

*Malone v. Bureau of Indian Affairs,* Civ. No. S–92–191 EJG/JFM (E.D.Cal. filed December 10, 1992).

The only published BIA regulation governing eligibility for higher education grants for Native Americans provides that "[f]unds appropriated by Congress for the education of Indians may be used for making educational loans and grants to aid students of *one-fourth or more degree of Indian blood* attending accredited institutions of higher education...." 25 C.F.R. § 40.1 (1993) (emphasis added). This regulation has been in effect since 1957. It is undisputed that, under § 40.1, the Malones would qualify for higher education grants.

However, in *Zarr v. Barlow,* 800 F.2d 1484 (9th Cir.1986), a case involving a student (7/32 Pomo Indian by blood) who did not meet the one-fourth Indian blood standard but who was a member of a federally recognized tribe, this court appeared to invalidate § 40.1. In concluding that the BIA must consider the student eligible for higher education grants notwithstanding the "restrictive" blood standard of § 40.1, *Zarr* found determinative Congress's adoption of a "more inclusive" eligibility criterion in the Indian Financing Act ("IFA"), 25 U.S.C. § 1451–53 (1983) (enacted in 1974). *See Zarr* at 1489–91. The IFA, which authorizes federal *loan* programs, stipulates that all members of federally recognized tribes, re-gardless of the degree of Indian blood, are eligible for loans. 25 U.S.C. § 1452.[1]

In *Zarr,* we reached our decision by taking a somewhat circuitous path. We first noted that, insofar as § 40.1 covers eligibility for grants (the provision applies by its express terms to both "loans and grants"), it relies on the wrong statutory authority. *See Zarr* at 1487. In promulgating § 40.1, the BIA cited as authority § 471 of the Indian Reorganization Act, 25 U.S.C. §§ 461–479 (1983) (enacted in 1934), a provision that authorizes the BIA to expend funds only for *loans.* Although concluding that the BIA's reliance on the loan authorization statute for its grant program was misplaced, we found congressional authority for the program in the Snyder Act, 25 U.S.C. § 13 (1983) (enacted in 1921), a statute passed in 1921 that broadly provides for "the benefit, care, and assistance of the Indians throughout the United States." *See id.* at 1487–88. Despite this conclusion, we reasoned that, because the BIA previously had relied on the loan authorization statute in developing its eligibility criteria for grants, it could not deny eligibility to an applicant who would be qualified for loan assistance under the new standard adopted by Congress in the IFA. *Id.* at 1489–91.

BIA officials subsequently circulated two internal memoranda interpreting *Zarr* and setting forth new eligibility criteria for grant programs. In a memo dated November 26, 1986 addressed to BIA area directors and education program administrators, Assistant Secretary of Indian Affairs Ross O. Swimmer reported that the one-quarter Indian blood criterion had been eliminated by *Zarr* for higher education programs, and he announced that eligibility for such programs henceforth would be extended solely to members of "tribe[s] eligible to receive services from the Department." Swimmer, however, distinguished elementary and secondary school grant programs from the Higher Education Grant Program, and informed the program administrators in his memo that the blood standard should continue to apply in determining eligibility for the former pro-

---

1. The statutory definition reads: " 'Indian' means any person who is a member of any tribe ... which is recognized by the Federal Govern-ment as eligible for services from the Bureau of Indian Affairs." *Id.*

grams. Just over two years later, in an internal BIA memo dated February 21, 1989, Wilson I. Babby, Deputy to the Assistant Secretary, announced that to be eligible for higher education grants, a student must meet one of the following criteria:

1. The student is an enrolled member of a federally recognized tribe.
2. The student is at least one-fourth degree Indian blood descendant of a member of a federally recognized tribe.
3. The student, if he/she alleges he/she is to be considered a member of the Yurok Tribe or any other tribe that does not have membership standards, is at least ½ degree Indian blood of a federally recognized tribe(s).

As the Swimmer and Babby memoranda attest, the BIA reads *Zarr* as *mandating* that, pursuant to the IFA, it may award higher education grants solely to members of "federally recognized tribes" or their descendants. Thus, even though the BIA never formally amended § 40.1 through APA notice and comment procedures, the BIA argues that it acted properly. The BIA contends that in restricting grant eligibility to members of federally recognized tribes and their descendants, and in denying the applications of the Malone brothers, it simply was following *Zarr*.

The Malones argue that, although *Zarr* requires the BIA to make grant funds available to all members of federally recognized tribes, it does not affect the validity of the one-quarter blood standard as applied to individuals who, like themselves, are not members of federally recognized tribes. The Malones also note that the eligibility criteria set forth in the two BIA memoranda go beyond the express terms of the IFA, defeating the BIA's own argument that the memoranda merely implement the *Zarr* court's command to apply the IFA standard. The Malones point out that the Swimmer memo applies the IFA standard to higher education programs but not to elementary and secondary school programs, despite the lack of foundation for the distinction in the text of the IFA. The Malones also point out that the Babby memo confers eligibility on one-quarter blood *descendants* of members of federally recognized tribes, thus conferring eligibility on at least some applicants who would not be eligible pursuant to the express terms of the IFA, and incorporating a variant of the very blood standard ostensibly repudiated in *Zarr*.

The brief of the Amici Curiae, filed jointly by a number of federal and state tribal organizations, provides an historical overview of the unique status of the California Indians and describes the long-standing, special trust relationship between the federal government and the California Indians. In the 1850s, Congress failed, due to pressure from California congressmen, to ratify treaties that the federal government had entered into with California Indian tribes. In recognition of its moral obligation, however, the federal government extended a variety of benefits to California Indians, many of whom had become landless as a result of government-sanctioned land policies. This process culminated in the California Indians Appropriations Act of 1965, which provided compensatory payments for descendants of Indians who were residing in California on June 1, 1852. Pursuant to this Act, a list of eligible individual recipients was prepared by the Secretary of the Interior. Both Gene and Greg Malone are enrolled on this list, and are officially recognized as California Indians eligible for certain federal benefits, including those made available in programs sponsored by the Indian Health Service under the authority of the Snyder Act.

On the basis of this history, the brief of the Amici also raises one argument not contained in the Malones' brief. The Amici argue that, given Congress's oft-reiterated recognition of its special trust relationship with the California Indians, Congress should be deemed to have manifested its intent to extend eligibility for federal programs and services, including higher education grant programs, to California Indians regardless of the legal status of their tribes.

## DISCUSSION

### I. THE PROPER INTERPRETATION OF ZARR

As described above, the parties disagree fundamentally about the meaning of *Zarr*.

Although both parties' interpretations find support in certain passages in *Zarr*, we conclude that neither interpretation is entirely correct—the opinion neither mandates that the BIA adopt the federally recognized tribe standard as the sole criterion for grant program eligibility, nor mandates that the BIA continue to apply the invalidated criterion to applicants who are not members of such tribes. By concluding that continued exclusive use of a blood standard is inconsistent with recent expressions of congressional intent, *Zarr* invalidated § 40.1. By concluding that the statutory authority for the BIA's Higher Education Grant Program lies in the broad provisions of the Snyder Act, rather than in the Indian Reorganization Act, *Zarr* also implicitly left the ultimate determination of an appropriate new standard to the agency.

■ We take as our starting point the well-recognized principle of administrative law that a court must leave for resolution by the agency those issues that are within the agency's competence and delegated authority. *See Milk Transp., Inc. v. I.C.C.*, 190 F.Supp. 350, 355 (D.Minn.1960), *aff'd per curiam*, 368 U.S. 5, 82 S.Ct. 15, 7 L.Ed.2d 16 (1961); *cf. Department of the Treasury v. Federal Labor Relations Auth.*, 494 U.S. 922, 933, 110 S.Ct. 1623, 1629–30, 108 L.Ed.2d 914 (1990) (refusing to consider a proposed interpretation when the agency did not consider the issue because doing so would usurp the agency's authority to "give reasonable content to the statute's textual ambiguities"). From this principle, it follows directly that, after invalidating § 40.1, we lacked the authority to dictate the precise standard that the BIA should adopt under the proper statutory authority.

In *Zarr* itself, we noted that the Snyder Act contains neither specific eligibility criteria nor any suggestion that eligibility for programs developed under the Act should be determined by criteria set forth in any other federal statute.[2] *Id.* at 1490. As this court previously explained:

> [B]y sending its statute to the relevant agency for implementation, [Congress] has delegated to that agency the function of choosing between implicit statutory options. The duty of the court in this circumstance is to keep the agency within the bounds of its delegated authority.... Thus, the judicial role may often be, as one commentator has put it, to "specify what the statute cannot mean, and some of what it must mean, but not all that it does mean."

*Air North America v. Department of Transportation*, 937 F.2d 1427, 1432 (9th Cir.1991) (quoting Monaghan, Marbury and the Administrative State, 83 Colum.L.Rev. 1, 27 (1983)). Absent an authoritative interpretation of the governing statute by the agency, we decline to accept the invitation of either party to define "all that [the Act] does mean" in the context of the BIA's Higher Education Grant Program.

It is true that we indicated in *Zarr* that the BIA should consider members of federally recognized tribes eligible for higher education grants. We reasoned that it was manifestly inconsistent for the BIA to ignore the IFA on the rationale that the IFA is concerned exclusively with loans, when the *very provision* the BIA relied on to deny eligibility to Zarr, § 40.1, was promulgated under the direct statutory predecessor of the IFA. *See id.* at 1488–93. Our conclusion thus was meant to apply only in the absence of a standard promulgated by the BIA directly under the Snyder Act.

Moreover, although we made clear in *Zarr* that the blood standard could no longer be the *sole* eligibility criterion, we did not rule out all applications of a blood standard. *See id.* at 1492 (noting that "Congress is concerned that a one-quarter degree blood quan-

---

**2.** For a recent overview of the different eligibility criteria used in the myriad federal statutes and regulations governing federal programs for Indians, see Sharon O'Brien, "Tribes and Indians: With Whom Does the United States Maintain a Relationship?" 66 Notre Dame L.Rev. 1461, 1479–89 (1991). O'Brien notes that although membership in a federally recognized tribe is a commonly used criterion, racial criteria are also prevalent. As O'Brien summarizes the situation, "a number of programs are open only to those Indians who possess one-quarter to one-half blood quantum; enrollment in a federally recognized tribe is not required. Other programs require proof of enrollment and a certain degree of Indian blood." *Id.* at 1489.

tum *without more* is ... impermissible...") (emphasis added). Our emphasis, rather, was on making clear that general assistance programs under the Snyder Act are for the "special benefit" of all Indians, and that any ambiguities should be resolved in favor of *inclusion. Id.* at 1493. In this context, we note that, subsequent to *Zarr,* Congress adopted an inclusive standard for a Snyder Act program, one which appears to extend eligibility to individuals like the Malones. In the 1988 Amendments to the Indian Health Care Improvement Act of 1980 ("IHCIA"), 25 U.S.C. § 1679 (West Supp.1994), Congress extended eligibility not only to members of federally recognized tribes, but also to certain categories of California Indians. Senator Cranston, who cosponsored the legislation, stated the rationale for extending eligibility to California Indians:

> The California Indian population is unique in this country and must be understood in historical context. In the 1850s, Congress failed to ratify treaties that the Federal Government had entered into with Indian tribes in California. Thus, although they were eventually recognized in Federal law as individual "Indians of California," many California Indians are not members of federally recognized tribes.... [F]airness required the development of policies ... providing specifically for California Indian's eligibility for IHA care.

134 Cong.Rec.S. 13565 (daily ed. Sept. 28, 1988). Nothing in *Zarr* forecloses comparable action by the BIA in the education grant context.

## II. THE MALONES' CLAIM FOR DE-CLARATORY RELIEF

The Malones first seek a declaration that the BIA's administration of the Higher Education Grant Program violated its own published regulations, the Administrative Procedure Act ("APA"), the authorizing statute, and its trust responsibilities. Based on its conclusion that *Zarr* interpreted the IFA to mandate that the BIA apply the "membership in a federally recognized tribe" standard as the sole eligibility criterion for its grant programs, the district court determined that the Swimmer and Babby memoranda were both "interpretative rules," and, as such, free from the APA's notice and comment rulemaking requirements. Because the district court's premise was wrong, its conclusion cannot stand. In light of our holding that *Zarr* invalidates the § 40.1 criterion and does not dictate what criteria the BIA should adopt in its place, we conclude that the BIA's informal adoption of a new standard via the Swimmer and Babby memoranda violated the APA.

■ The APA requires that agencies publish notice of proposed rules in the Federal Register in order to give interested members of the public an opportunity to comment. 5 U.S.C. § 553(b) & (c) (1983). The § 553 requirements do not apply, however, when the agency merely adopts "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id.,* § 553(b)(3)(A). Interpretative rules "merely clarify or explain existing law or regulations," *Powderly v. Schweiker,* 704 F.2d 1092, 1098 (9th Cir.1983), and do not "foreclose alternate courses of action or conclusively affect rights of private parties," *Linoz v. Heckler,* 800 F.2d 871, 877 (9th Cir. 1986) (citations omitted). The Swimmer and Babby memoranda do not set forth interpretative rules; instead, they articulate a new standard in the wake of *Zarr's* invalidation of the prior standard. This new standard goes beyond faithful implementation of a pre-existing rule, and introduces a new eligibility standard that, although consistent with *Zarr,* is not the only standard that would so qualify. The new standard thus both "forecloses" other options, and "conclusively affects the rights" of individuals like the Malones. Consistent with *Zarr,* and pursuant to its authority under the Snyder Act, the BIA also could have extended eligibility more broadly, including, for example, enrolled California Indians, as do the 1988 Amendments to the Indian Health Care Improvement Act, *see supra.*

When we held in *Zarr* that the proper statutory authorization for BIA grant programs was the Snyder Act, and emphasized that exclusive use of the blood criterion was no longer consistent with legislation governing eligibility for BIA education programs, the BIA was obliged to promulgate a new set

of eligibility criteria pursuant to APA rule-making requirements. Because it is uncontested that the BIA did not follow the APA's notice and comment rulemaking procedures when promulgating the new standard, we reverse the district court and declare invalid the standard adopted in the internal BIA memoranda.[3]

## III. THE MALONES' CLAIM FOR INJUNCTIVE RELIEF

■ The Malones also seek an order enjoining the BIA from conditioning their eligibility for grants on membership in a federally recognized tribe. The district court concluded that *Zarr* mandates such a result, and rejected their claim. Although we conclude, as detailed above, that the district court, like the BIA, reads *Zarr* too broadly, we cannot grant the relief the Malones seek. *Zarr* holds that the proper authority for the grant program is the Snyder Act's directive to the BIA to provide for "the benefit, care, and assistance of Indians throughout the United States." 25 U.S.C. § 13. In view of the lack of specification in the Snyder Act as to what programs, let alone what eligibility criteria, the BIA must adopt, there can be no question that the promulgation of eligibility criteria for a program established under the Act is a matter consigned to the agency in the first instance. *See Department of the Treasury*, 494 U.S. at 933, 110 S.Ct. at 1629–30; *Puerto Rico Higher Educ. Assistance Corp. v. Riley*, 10 F.3d 847, 854 (Ginsburg, J., dissenting) ("Where a statute that the agency has been entrusted to administer is ambiguous, it is the obligation and province of the agency to interpret it in the first instance.") (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Without a properly promulgated regulation before us establishing the eligibility of the Malones for grants, there is no basis for the injunction that the Malones seek.

We do not reach the argument of the Amici that, in light of Congress' long-standing recognition of its special trust relationship with California Indians, this court should hold that Congress intends that all such individuals be made eligible for higher education grants under the Snyder Act. We have not been briefed by either party on the history of Congressional and agency treatment of the Snyder Act's broad directive to "assist[ ] ... the Indians throughout the United States," 25 U.S.C. § 13, and, accordingly, we lack a sufficient basis on which to evaluate the requirements of the statute, if any, with respect to California Indians. *Zarr* makes clear that the Snyder Act does not permit exclusive use of a blood criterion, and we decline to consider whether any further restrictions or requirements are mandated by the language and legislative history of the Act. *See, e.g., Department of the Treasury*, 494 U.S. at 933, 110 S.Ct. at 1629–30 (declining to address the petitioner's argument that no reasonable construction could sustain the agency's interpretation of the statute in question, and emphasizing that the Court was "poorly situated to evaluate [the] argument" because it had not been fully briefed).

We emphasize that in formulating a new standard, the BIA must adopt criteria consistent with the broad language of the Snyder Act, and we encourage the BIA to look to eligibility criteria used in other Snyder Act programs, such as those set forth in the 1988 Amendments to the IHCIA, for guidance when promulgating the standard for grant programs. *Cf., e.g., Phillips Petroleum Co. v. Federal Energy Regulatory Comm'n*, 792 F.2d 1165, 1172 (D.C.Cir.1986) (discussing possible applications of the statutory language "to illustrate the complex task forsaken by [the agency] when it incorrectly concluded that it was bound by [a prior court decision]").

---

**3.** Subsequent to the filing of the briefs and oral argument in this appeal, the BIA issued notice of proposed revisions to 25 C.F.R. § 40.1, seeking public comment on the proposed changes pursuant to APA rulemaking requirements. *See* Administration of Educational Loans, Grants and Other Assistance for Higher Education, 59 Fed. Reg. 18,460 (proposed April 18, 1994). The proposed regulation, which cites *Zarr*, extends eligibility for the Higher Education Grant Program to members of federally recognized tribes and their "¼ degree Indian blood descendent[s]." *Id.* at 18,461. The proposal makes no reference to California Indians. We express no view on the validity of the proposed rule.

### CONCLUSION

For the reasons stated above, we conclude that *Zarr* invalidated the blood quantum requirement contained in 25 C.F.R. § 40.1, putting the onus on the BIA to promulgate new eligibility criteria for its grant programs. Because the BIA did not follow APA rulemaking procedures when it adopted criteria via internal memoranda, we reverse the district court and hold that those criteria are invalid. We affirm the district court's denial of the injunctive relief sought by the Malones, however, because, without a properly promulgated regulation before us establishing the eligibility of the Malones for higher education grants, there is no basis for the injunction. Although we deny the injunction, nothing in this opinion should be read to preclude the Malones from seeking reconsideration of their applications before the BIA. The BIA's basis for rejecting their applications was flawed, and we leave to the discretion of the agency the decision as to whether to reconsider their applications in light of the clarification of *Zarr* set forth in this opinion.

**AFFIRMED IN PART and REVERSED IN PART.**